STATE of Missouri, Respondent,

v.

James L. ANDING, Appellant.

No. WD 34834.

Missouri Court of Appeals,
Western District.

March 5, 1985.

Application to Transfer Denied
May 29, 1985.

Donald L. Wolff, Wolff & Frankel, Ellyn L. Sternfield, Clayton, for appellant.

John Ashcroft, Atty. Gen., Michael H. Finkelstein, Asst. Atty. Gen., Jefferson City, for respondent.

Before CLARK, P.J., and SHANGLER and NUGENT, JJ.

SHANGLER, Judge.

The defendant Anding, an attorney, was convicted by a jury of tampering with a witness in violation of § 575.270, RSMo 1978, and was sentenced to a term of three years. The conviction rests on an episode of misconduct alleged against Anding in the defense of one Robert Watters, Jr., charged in the circuit court of Franklin County with the theft of a watercraft, a class C felony. The essence of that accusation was that Watters stole a johnboat and trailer, the property of one George Hall. The conviction of defendant Anding was for tampering with Hall by payment of money to induce his absence as a witness from the preliminary hearing in the cause against Watters.

The genesis of events was an incident observed on January 19, 1981, by Susan Hall, wife of George Hall. The husband was away from home and Susan was baby-sitting, her usual gainful occupation. As she looked out the window, Susan saw a blue Datsun pickup truck back onto the driveway, attach a chain onto the tow of a johnboat the Halls owned, and drive away. Susan telephoned a neighbor and another man to learn if George had consented to its use by either, and then notified the police of the theft. Two weeks later Susan saw the Datsun truck parked at a residence nearby and both she and her husband informed the police. The police made an arrest and at the lineup Susan identified Watters as the person who towed the boat away.

In due course Watters was arraigned and the preliminary hearing set for April 10, 1981. The accused was represented by Anding and the state by assistant prosecutor Melenbrink. The cause was continued at the instance of first one and then the other of the principals, and rescheduled for July 30, 1981. Subpoenas had reissued to compel the attendance of both George and Susan Hall, but only George Hall appeared on that date. The cause was reset for August 6, 1981, subpoenas reissued to each Hall spouse for that date, but neither was found for service—and on August 5, 1981, prosecutor Melenbrink entered a nolle prosequi.[1] The prosecutor assigned no formal

---

1. The sequence of these events came into evidence as narrations of circuit court division clerk Corinne Wagner from entries in the official court file in *State of Missouri v. Watters,*

reason for the discontinuance.[2] Thereafter, within the month, prosecution commenced against Anding.

The original information charged Anding with three counts of criminal conduct: Count I alleged the class D felony of tampering with physical evidence [§ 575.100];[3] Count II alleged the class D felony of concealing an offense [§ 575.020]; Count III alleged the class D felony of tampering with a witness [§ 575.270]. On the day of trial, the prosecutor entered a memorandum of nolle prosequi as to Count I and interlined the information to redesignate the other two counts numerically. The two counts for concealing an offense and for tampering with a witness, now renumbered Counts I and II, were pleaded and submitted as alternatives. The verdict of guilty was returned on Count II, tampering with a witness.

The terms of that accusation bear on contentions of error the defendant asserts for reversal, so we delineate the full charge:

### COUNT II

Comes now Richard G. Callahan, Special Prosecuting Attorney for the County of Franklin ... and ... charges that the defendant, James L. Anding, in violation of Section 575.270, RSMo, committed the class D felony of tampering with a witness ... in that on or between May 1, 1981 and July 31, 1981 ... the *defendant with the purpose to induce George L. Hall to absent himself as a witness in an official proceeding,* to-wit: the preliminary hearing in State v. Robert Watters, Jr., Cause No. CR381–200F, wherein Robert Watters, Jr., was charged with the felony of stealing a watercraft, and *conferred benefits upon George L. Hall, namely, money payments.* [emphasis added]

The submission of that count was in the essential terminology of the information, and conformable to the MACH–CR 29.86 prototype for that offense which requires the identity of the tampered witness.

The prosecution case was presented through witnesses Corinne Wagner, Susan Hall, Timothy Melenbrink, and Mari Koppelmann. George L. Hall was endorsed as a witness, and [as noted by the court] appeared at the trial, but was not called. Corrine Wagner, circuit court division clerk, came as custodian of the court records and established the essential events of the *State v. Watters* watercraft theft prosecution by reference to the contents of that file—including the discontinuance of the cause by nolle prosequi.

Melenbrink also established the sequence of events of that earlier prosecution through recollections refreshed by prior consultation with the official case file. He gave explanation that he was prompted, first to continue the cause to August 6th when *Susan Hall failed to appear* for the preliminary hearing on July 30, 1981, and then to the entry of nolle prosequi because "[he] was unable to contact [his] witnesses and assure their appearance on the 6th [of August]." The prosecutor elaborated the reason for the continuance: that although *George Hall appeared,* the testimony of wife Susan was essential to the case, and

---

Cause No. CR381–200F, and from recollections of prosecutor Melenbrink, refreshed by consultation with the official file. The defendant Anding objected in limine, at the trial, and on this appeal that § 610.105 closes the contents of a criminal file terminated by a nolle prosequi as to all persons except the person arrested or charged. Therefore, the defendant argues, the evidence of the former prosecution against the objection of Watters was erroneously received, and was prejudicial to a fair trial for Anding. We confront that contention with the others, in turn.

2. The charge was then refiled against Watters and at the time of the trial the charge against Anding, still pended.

3. Count I charged that Anding presented to prosecutor Melenbrink certain documents [purportedly genuine copies of a promissory note executed by George Hall for $2500 in favor of Audrey Watters and a chattel mortgage to the benefit of Audrey Watters—both under date of June 23, 1980] while knowing them to be false, all with the purpose to mislead Melenbrink in the prosecution of *State v. Watters,* Cause No. CR381–200F.

he could not have "gotten by at a preliminary hearing with only his testimony." The responses elicited from Melenbrink on cross-examination, however, disclosed a decision for continuance already formulated, and a decision for nolle prosequi whatever the readiness of *Susan Hall* to testify.

Q. As a matter of fact, there was another reason that you asked for the continuance [from July 30 to August 6, 1981] that had nothing to do with Sue Hall's being there, or not being there, isn't that true?

A. There was another reason, yes. I indicated to the Judge that information had been provided to me that day that I wanted to check into and Mrs. Hall was not available, yes.

. . . . .

Q. I understand. So part of the reason for asking for the continuance had nothing to do with Sue Hall not being there, isn't that right?

A. Yes.

Q. *And as a matter of fact, the defendant stands here tried on a charge that has nothing to do with Sue Hall not being here....*

. . . . .

A. *It has nothing to do with Sue Hall's non-appearance on July 30th, yes, that's correct.*

. . . . .

Q. So the fact that the subpoena [for the August 6, 1981 hearing date] wasn't served, that subpoena's got nothing to do with why you dismissed?

A. No, I wasn't waiting for a subpoena.[4]

[emphases added]

Thus, these responses of Melenbrink make clear that whatever prompted the entry of the nolle prosequi to the Watters theft prosecution, the discontinuance was not based on the failure of Susan Hall to testify. That is to say, there is no issue that any want of responsiveness to judicial process by Susan Hall induced the charge against Anding, or bears to prove his guilt. The criminal culpability of the defendant Anding rests—if at all—on the proof of the charge [in the terms of the information and submission] that Anding "conferred benefits upon *George L. Hall,* namely, money payments, ... with the purpose *to induce George L. Hall to absent himself as a witness in an official proceeding, to-wit: the preliminary hearing in State v. Robert Watters, Jr., Cause No. CR381–200F.* " [emphasis added] The proof essential for conviction, therefore, was evidence of a transfer of money by Anding to George L. Hall *with the purpose to induce Hall* to absent himself from the Watters prosecution. § 575.270.

 In the perspective of the issue as defined, we turn to the testimony of Susan Hall. She was presented as a witness for the prosecution, and her testimony, if allowed to stand, sustains conviction. The defendant contends that her trial narrative was for the most part inadmissible hearsay. That extensive testimony is punctuated with objections by counsel, voir dire examinations, offers of proof, and consultations at the bench. There were responses of admissible fact elicited from the witness [other than the observation of the theft of the boat], however, about which there is no cavil: Susan and George Hall were husband and wife, the parents of two children. The husband had been idle for some six months from the usual employment at Chrysler. The wife was a babysitter for hire. The johnboat and trailer were purchased from one Longreer for $500 about a year before the theft. The property was

---

4. That response, we assume, refers to an investigation which then preoccupied Melenbrink [see footnote 3]. Anding had presented to the prosecutor on behalf of George Hall that the removal of the boat and trailer from the Hall premises was mistakenly reported to be a theft. Rather, it was a repossession under a chattel mortgage executed in favor of Watters. In May of 1981,

Hall repaid the insurance carrier the $500 received for the reported loss, and reacquired title to the property. It was about this time that the Halls informed Detective Horn, investigator for Melenbrink, that Hall would not continue the prosecution of the boy Watters. This information was developed on a pretrial motion to suppress testimony, and was not before the jury.

insured under the Hall homeowners policy and on February 18, 1981 [about a month after the theft], the insurance company paid the Halls $500 for the loss, and they transferred title. George Hall purchased an Atari set with that sum. The only income available to the Hall couple during the early and middle of 1981 was the $105 weekly unemployment compensation George received and some $50 Susan earned weekly from babysitter work. During that period, however, husband George came into an unexplained sum of $2000. They used the money for a car and a carport.

It was when inquiry turned to the subject of the Watters preliminary hearing prosecution that the hearsay objections of counsel were lodged. Susan Hall had responded that she and her husband had not been served with subpoena for appearance until some time in June of 1981. They did not appear [no doubt because, as Melenbrink testified, the cause was continued at the request of the prosecutor]. Susan then testified that they were again served with subpoena for July 30, 1981, but that she did not respond, although her husband did. The inquiry by the prosecutor continued:

Q. And how did your husband get to court? Who took him? Did he drive or did somebody take him?

A. No, Jim Anding came and picked him up in a brown van.

Q. Well why didn't you go to court with your husband?

A. Well, I was told by George....

Counsel for defendant interrupted to object that the response was hearsay: "to anything she was told by George as being hearsay." The prosecutor made rejoinder that the testimony was offered "not for the truth, but *as to why she didn't go to court.*" [emphasis added] Counsel went to the bench and outside the hearing of the jury presented the respective positions. Counsel for the defendant noted to the court that George Hall was an endorsed witness for the state "and will be testifying in this case, and he can testify as to what he told his wife"—and repeated the hear-

say objection. The prosecutor once again asserted that the testimony was "not being offered for the truth of the matter." The court sustained objection.

The inquiry by the prosecutor continued:

Q. Well, Susan, is it fair to say you didn't go to court that day because of something your husband told you?

A. Yes.

The prosecutor then elicited that Anding and husband George left for court around 9:00 a.m. on that day, and George returned around 2:00 p.m.:

Q. And when your husband came back, what happened?

A. He told me to get....

Counsel for defendant promptly objected to the hearsay, and the court ruled to exclude the answer on that ground. Counsel once again approached the bench and, after the substance of the proposed testimony was intimated to the court, the prosecutor was allowed an offer of proof. The examination of witness Susan Hall resumed for that purpose [outside the presence and hearing of the jury] and the proof proposed recapitulated to the court.

The court determined to allow the tendered proof under instructions to the jury. The court took the objection of the defendant as preserved. The court then addressed the jury:

Members of the jury, I anticipate that Mr. Callahan [the prosecutor] is going to inquire of this witness concerning certain statements allegedly made to her by her husband, George Hall.

The Court is going to allow that testimony but I'm instructing you now that *I am admitting those statements not to prove the truth of the statements, but only that the statements were made to her and to explain her conduct or behavior.* [emphasis added]

Susan Hall then proceeded to give this narrative to the jury. When husband George returned home from court in the afternoon of July 30, 1981, he told her: "Get packed. We have to get out of here."

When she asked why, he said, "We've just got to get out of here." She asked what they would do with the children left in her care, and George responded he would get the neighbor to come over and watch them. She then asked "where we were going to get the money," and he responded: "Don't worry about it." She packed clothes, the husband engaged a neighbor to watch the children, and they left. They drove to a Holiday Inn in nearby Sullivan and spent the night. There the husband made some telephone calls. The next night George left the room and instructed her that if anyone came, to say that he would be in the lobby. A person did come, knocked on the door, and asked: "Is George here?" She responded that he was in the lobby. That man was the defendant Anding. Then the husband returned within ten minutes and told her "he had the money for us to finish the trip." George showed her $400. The husband told her that they would remain there that night and then leave in the morning. The next day, Saturday, they drove to Baxter Springs, Kansas, where the mother of the witness resided. Susan and her husband were not expected. It was not a planned trip, but her father was seriously ill at the time, and she was pleased to be there. They remained about a week, and were still there on August 6, 1981 [when the preliminary hearing in the Watters case was scheduled]. She gave evidence, as we note, that the only source of income for the family were the unemployment benefits due the husband and her own earnings from the care of children. In this interim, however, the husband came into $2000 from an unexplained source. The witness gave opinion that such a sum was beyond the value of the johnboat taken from the premises.

The cross-examination by counsel for defendant elicited from wife Susan that George had told her, in effect, that he had approached Anding and told him George "wanted to be made whole" for the loss of the boat. Then, about the first part of June [of 1981] George told her: "that if I was approached by anyone, to say that he and Anding had worked something out and those were the words that he told me." Susan acknowledged that when husband George returned to the Holiday Inn room with $400 after the Anding visit, he told her that "there were no strings attached" to that money. He did not say that the money was for nonappearance at court on August 6th, the next week. The witness then recalled that her husband told her that May that the $2000 sum, later used for a carport, "was given to him in return for his boat being taken and with no strings attached." That money, too, [redirect examination drew out] was from Anding. The witness then testified that they returned home from Baxter Springs on August 7, 1981.

The prosecutor resumed examination of the witness. Susan first learned that her husband "had been having some dealings with Mr. Anding" some time after March. George simply told her that "they had worked something out." More exactly, George told Susan that "as a Brother Mason, that he would get paid four times what the boat was worth to be made whole." George became a Mason in March of 1981. Susan was not told of that event, but knew that Anding, too, was a Mason. [The witness testified earlier that the elder Watters, father of defendant Watters, was also a Mason.] In addition to the $400 transferred at the Holiday Inn, and the $2000 to make George whole for the loss of the boat, George told Susan that Anding had given him other money to repurchase from the insurance company the title to the johnboat. Susan repeated that she informed Detective Horn, investigator for prosecutor Melenbrink, that George had told her that her husband and Anding had "worked something out" and "[t]hat's what George told me to tell anyone who had come by to ask me about the case"—even to the police. Susan testified also that when George returned from court on July 30th, he came back with money—but had no money when he left. That was the very money used for the motel room later in the day. George told her only that the funds had come from a "Brother Mason."

The final witness for the prosecution was Mari Koppelmann, registration clerk at the Holiday Inn in Sullivan, Missouri. She was on duty on July 30, 1981 and worked that night. George Hall and family registered at the inn somewhat after 3:00 p.m. on that day. Hall paid the room rent in cash, and stayed two nights. The witness had occasion to see Hall again on the second night. She saw Hall and another man in conversation in the lobby of the motel. She passed them as she went on an errand and saw Anding hand a wad of money to Hall. She identified the other man to the transaction as Anding.

## I

### THE HEARSAY OBJECTION

The defendant Anding contends that the statements by George Hall to wife Susan related by her from the stand were hearsay, and therefore not admissible. The prosecution contends that the responses given by witness Susan Hall to the direct examination—that she did not attend the July 30 preliminary hearing because George told her not to, that George told her on his return from that court session to pack because "[w]e have to get out of here," and the later directions and disclosures by George to her at the Holiday Inn and related in evidence—were tendered and received, not as testimonial assertions, but to explain the subsequent conduct of Susan Hall, and therefore admissible for that purpose. The prosecution explains that the statements by husband George to wife Susan were received only to show: "why she left home in such a hurry to go to a motel twenty-five miles away; why she stayed two nights at the motel; and why she told Anding to meet George in the lobby." The prosecution concludes: "If there is damaging testimony here, it does not stem from George's statements, but from Susan's actions." The charge on trial, however, was that Anding tampered with witness *George Hall* by the conferral of money payments with the purpose to induce *that witness to absent himself* [and not wife Susan] from the preliminary hearing against Watters.

The essential hearsay rule rejects assertions offered testimonially, which have not been in some way subjected to the test of cross-examination. 5 Wigmore, Evidence § 1362 p. 6 (Chadbourn rev. 1974). That principle expresses the rationale that to secure the trustworthiness of testimonial assertions, and to afford opportunity to test the credit of the witness, "such assertions are to be made in court, subject to cross-examination." *State v. Chernick,* 280 S.W.2d 56, 60[5, 6] (Mo.1955). The hearsay rule rests on the postulate, therefore, that " 'the many possible deficiencies, suppressions, sources of error and untrustworthiness, which lie underneath the bare untested assertion of a witness may be best brought to light and exposed by the test of cross-examination.' " *State v. Kirkland,* 471 S.W.2d 191, 193[1] (Mo.1971). The vice of hearsay, therefore, is that the testimony tendered as evidence rests on the credibility of an asserter who is beyond the reach of cross-examination. McCormick on Evidence § 26 (Hornbook Series 1972). The rule by very definition excludes only extrajudicial statements offered testimonially: that is, to prove the truth of the matters they assert. Thus, out-of-court declarations tendered not as proof of the matters asserted, but to explain subsequent conduct of the witness, are not within the compass of the hearsay exclusion— *but only* when that conduct relates to an issue before the jury. *State v. Harris,* 620 S.W.2d 349, 355[13–14] (Mo. banc 1981).

The qualifications for the admission of such evidence as an exception to the hearsay rule are posited in our decisions. In *State v. Kirkland,* 471 S.W.2d 191 (Mo. 1971), the defendant was charged with robbery for the theft of money from a cab driver. At trial, a police officer testified he arrested defendant because one Mrs. Mayo told him that defendant was one of the persons who had earlier left in the cab, later robbed. Mrs. Mayo was not called as a witness, and therefore was not available for cross-examination. Her statement, however, was the only prosecution evidence to identify the defendant as one of the

perpetrators. The prosecution contended that the testimony was admissible on the theory that the statement was offered, not for the truth of the matter asserted—that is, that it was defendant who entered the cab—but to show that the witness officer relied on it in the course of his subsequent conduct. The court responded that neither the fact that Mrs. Mayo made the statement to the officer nor his conduct consequent upon the statement was material or relevant to any issue [l.c. 194[2]]:

> "[N]either the fact that Mrs. Mayo made the statement to [officer] Jones, nor whether he was justified in relying on it, was material or relevant to any issue before the jury."

The court rejected the testimony because the extrajudicial Mayo declaration had no bearing [l.c. 194]:

> "except [on] the issue of whether or not the defendant did, in truth and fact, board McGuire's cab, as Mrs. Mayo allegedly asserts, and participate in the robbery of McGuire. As to this issue, the truth of the matter asserted is of prime importance and defendant was entitled to cross-examine the person upon whose credit the matter was asserted as being the truth, to-wit, Mrs. Mayo ... Defendant was denied the right of cross-examination secured by the confrontation clause of the Constitution of Missouri 1945, Art. I, § 19(a) ..."

*See also: State v. Chernick,* 280 S.W.2d 56, 60[5, 6] (Mo.1955); *State v. Schuh,* 497 S.W.2d 136, 138[2] (Mo.1973); *State v. Favell,* 536 S.W.2d 47 (Mo.App.1976).

■ We assume the premise of the contention by the defendant that the conduct of Susan Hall was entirely irrelevant to prove any element of the charge against George Hall, so that there was no evidential function for the extrajudicial declarations of George Hall through the trial witness of Susan Hall *on the ground tendered.* We determine nevertheless that the George Hall extrajudicial remarks were statements of a coconspirator, coenterpriser, coactor, or coabettor to advance and accomplish the unlawful purpose of the accused Anding to purchase the absence of witness George Hall at the *Watters* prosecution—and so qualify as competent evidence under another exception to the hearsay rule. *See State v. Reagan,* 654 S.W.2d 636, 640[2] (Mo.App.1983); *State v. Kennedy,* 177 Mo. 98, 75 S.W. 979, 984 (1903). A declaration made by one coconspirator in furtherance of the object of the unlawful combination is admissible against a party, but on conditions. The first condition is: There must be before the court independent and preponderant evidence of a conspiracy between the declarant and the party on trial. *State v. Deyo,* 358 S.W.2d 816, 824[12] (Mo.1962); *State v. Danforth,* 654 S.W.2d 912, 921[12–14] (Mo.App.1983). The other conditions follow: the declarations must be in furtherance of the object of the unlawful enterprise [*State v. Rayner,* 549 S.W.2d 128, 131[1] (Mo.App. 1977)], and must be made while the unlawful common purpose continues to subsist [*State v. Chernick,* 280 S.W.2d 56, 59[2–4] (Mo.1955)].

■ The full continuum of the George Hall extrajudicial statements was admissible under these principles. Anding was charged with the conferral of a money benefit on George Hall with the intent to induce the absence of that witness from the *Watters* prosecution. The evidence, we determine, independently of any extrajudicial narrative by Susan Hall, proves that George Hall abetted Anding to accomplish that unlawful purpose.[5] The official charge against Watters was brought on March 16, 1981, was scheduled for trial on August 6, 1981, and was discontinued by

---

5. The competency of the statements of a coconspirator of a party during the course and in furtherance of the conspiracy does not depend upon whether the witness is a coindictee or codefendant. "The principle upon which they are admissible at all being that the act or declaration of one is the act or declaration of all united in one common design...." *State v. Sykes,* 191 Mo. 62, 89 S.W. 851, 855 (1905). The witness George Hall, under the prosecution evidence, was subject to separate prosecution for the offense of *Acceding to Corruption,* § 575.-280.1(2), RSMo 1978, a Class D felony.

*nolle prosequi* on the day before. There was evidence that as early as "some time after March [1981]," George Hall began to deal with Anding. George Hall and Susan Hall received $500 from the insurer of the johnboat, and they transferred title. Then, sometime in May of 1981, George Hall—although unemployed and otherwise in debt even for necessaries—"came up with $2000." In that same month, George repaid the insurer the $500, and reacquired title to the johnboat. In the meanwhile, the *Watters* prosecution pended. On July 30, 1981, Anding came by the Hall residence and picked up George Hall, an endorsed witness, for the courthouse. The husband returned that afternoon and left in haste with wife Susan for a motel where Anding came to the door, spoke to wife Susan, requested George, was directed by her to the lobby, and was seen there by a motel employee to transfer "a wad of money" to Hall. The husband returned to the room and displayed to the wife $400 in currency. The next day they drove out of the state, remained away a week until after the scheduled *Watters* proceeding on August 6, 1981. That evidence was prima facie proof, without recourse to hearsay, of a subsistent conspiracy between Anding and George Hall to purchase the absence of that witness from the official *Watters* prosecution, and rendered admissible the extrajudicial statements of George Hall related on the Anding trial by Susan Hall. *State v. Reagan*, 654 S.W.2d 636, 640[2] (Mo.App. 1983). The remarks by husband George Hall related by Susan Hall at the trial all were made in the furtherance of the object of the unlawful enterprise and while that unlawful purpose subsisted—to induce the absence of George Hall from the August 6, 1961 *Watters* proceeding and so met those conditions of admissibility. *State v. Rayner*, 549 S.W.2d 128, 131[1] (Mo.App.1977); *State v. Danforth*, 654 S.W.2d 912, 920[8, 9] (Mo.App.1983).

▆▆ The evidence, although not tendered under that auspice and received only for a limited purpose under the instruction of the court—to explain the subsequent conduct of Susan Hall—was entitled to the unfettered scope due any other evidence on an ultimate issue. Thus, the instruction to the jury that the George Hall statements were admitted "not to prove the truth of the statements, but only that the statements were made to her and to explain her conduct or behavior" unduly favored the defendant and unduly restricted the proof of the prosecution case. That direction by the court, although a technical error, could not have disadvantaged the defendant. The defendant contends that shorn of the Susan Hall hearsay, there remains no substantial evidence of guilt. We determine that the hearsay was admissible and that a submissible case of guilt was proven.

II

THE STATUTORY QUESTION

The information charged that Anding paid money to George Hall to induce his absence as a witness from the official proceeding: State v. Watters, Cause No. CR381–200F, a criminal prosecution in Franklin County, Missouri. The proof of the charge, therefore, entailed evidence that there was a pendent official proceeding at which George Hall was to witness, but failed that expected duty. The testimony of court clerk Corinne Wagner—of the description of the proceeding, the principal actors, the chronology of the successive dates for hearing, the identity of George Hall as a witness endorsed for the prosecution, the sequence of subpoenas to summon his appearances, the entry of nolle prosequi, and other entries—rested altogether on these records. The testimony of prosecutor Melenbrink was also interspersed with recurrent references to that official source.

The defendant Anding contended at the trial, and now on appeal, that § 610.105, closes the official record in a prosecution terminated by a nolle prosequi to everyone except the person charged—and that since Watters, the person charged in that proceeding—made formal objection to the exposure of the records, neither the contents

of the file nor oral testimony based on those contents were lawful evidence.

The contention refers to the Arrest Records component of the Governmental Bodies and Records Act [§§ 610.010 through 610.115]. Section 610.105 of that 1973 enactment provided:

> If the person arrested is charged but the case is subsequently nolle prossed, dismissed or the accused is found not guilty in the court in which the action is prosecuted, *official records pertaining to the case shall thereafter be closed records to all persons except the person arrested or charged.* [emphasis added]

The defendant contends that *all persons* means everyone [prosecution and governmental authority included] except the persons arrested or charged—in this instance, Watters. Thus, the argument goes, the evidence from the official file in the *Watters* case, become a closed record consequent upon the entry of nolle prosequi, was interdicted by the statute.

Section 610.105 was amended in 1981 to close records also in a case where the arrest results in a suspended imposition of sentence— *except as provided in § 610.-120.* Section 610.120 [1981 Mo.Laws 638 § 1] enacts the proviso:

> Records required to be closed ... *shall be inaccessible to the general public* and to all persons other than the defendant except as provided in this section. *They shall be available only to courts,* administrative agencies, *law enforcement agencies,* and federal agencies *for purposes of prosecution, litigation, sentencing, parole consideration....* [emphasis added]

The prosecutor contends that, notwithstanding the Watters arrest and nolle prosequi occurred *before* the 1981 amendment to § 610.105 and the concurrent § 610.120 proviso, that latter enactment, rather than the 1973 version, governs the accessibility of the *Watters* official records for the prosecution against Anding. That argument rests on the postulate that the Arrest Records component of the Act prescribes a remedy of procedure—that is, the statute

delineates a procedure for closure of criminal files in certain instances, such as a nolle prosequi, and hence appertains to the Anding trial which falls within its terms, notwithstanding that prosecution commenced after the effective date of the 1981 amendment and enactment. [*See for instance Darrah v. Foster,* 355 S.W.2d 24, 29[3] (Mo.1962).] Thus, the argument concludes, the official *Watters* file and the testimony by clerk Wagner and prosecutor Melenbrink on the contents were enabled by the exception in amended § 610.105 and the proviso of § 610.120 that the record of a case terminated by nolle prosequi nevertheless be available to courts and law enforcement agencies for purposes of prosecution and litigation.

 A statute is construed to operate prospectively unless a contrary legislative intent appears clearly from the terms or by unavoidable implication. *St. Louis County v. University City,* 491 S.W.2d 497, 500[6] (Mo. banc 1973). The Arrest Records component of the Act discloses no intent for retroactive application. *Warren v. State,* 632 S.W.2d 67, 68[1] (Mo.App. 1982). The arrest of Watters and consequent nolle prosequi were events transacted *before* the 1981 amendment and proviso, and so the accessibility of that record for the Anding prosecution is governed by 1973 version of the statute.

 We conclude, nevertheless, that the official record in the *Watters* arrest and prosecution—discontinued by nolle prosequi—was proper evidence at the Anding trial. The 1973 as well as the 1981 versions of § 610.105 and the § 610.105 proviso are all components of the Arrest Records statutes [§§ 610.100 to 610.120] and are in turn encompassed by the Governmental Bodies and Records Act [§§ 610.010 to 610.120]. These sections form an integral enactment and are informed by a uniform definition of terms. Section 610.010 prescribes that as used in the Act *closed record* means *any record closed to the public.* Thus, even before the explicit proviso enacted by § 610.120 in 1981, the legislature made clear that a

record closed by a nolle prosequi [or other termination of prosecution short of conviction] thereby became inaccessible to the *general public*. That there was no legislative purpose to disable a court or prosecutorial authority from access to the records for evidence in a subsequent criminal litigation is clear from our decisions. Thus, in *State v. Burkhart*, 615 S.W.2d 565 (Mo. App.1981), the court observed [l.c. 567]: "The legislature certainly was aware that a new charge may be brought after a charge has been nolle prossed." Then, in *State v. Young*, 636 S.W.2d 684 (Mo.App.1982), the court iterated the *Burkhart* rationale, and extended the application [l.c. 686]: "Where a charge has been nolle prossed, we believe the legislature did not intend Section 610.-105 to preclude use of the closed court file in a subsequent prosecution of the same *or a related offense*." The formal charge that Anding tampered with a witness in the *Watters* proceeding *relates* to that offense and so enables access by the prosecutor to those records for the official litigation against Anding.

We do not rest decision upon the *Burkhart* and *Young* rationales, however. We read the 1973 Arrest Records statutes [as informed by the § 610.010 definitions] to preclude *absolutely* from access to a nolle prosequi closed record only the *general public*, and not an official arm of government whose discharge of function requires access to that information. That the 1981 § 610.120 proviso facilitates the *closed records* definition previously enacted rather that redefines the term was discerned in *State v. Young*, supra, 1.c. 686: "This [intendment of the legislature] is bolstered by a 1981 amendment to the arrest records statute, Section 610.120, RSMo Supp.1981, clarifying that closed records remain available for prosecution purposes."

It could not be otherwise. To accept the postulate of defendant Anding that the statute meant for the nolle prosequi to close the *Watters* file to all persons except Watters would be to place perjury, bribery and every other antic obstruction of the administration of justice beyond remedy.

## III

## MOTION FOR MISTRIAL OR, ALTERNATIVELY, FOR CONTINUANCE

A panel was summoned from the venire, and a jury of twelve persons and one alternate were selected to try the case. The jury separated, returned the next morning, and before the oath was administered, the prosecutor filed a memorandum of nolle prosequi as to Count I of the Information. The Information charged three offenses: Count I charged that Anding tampered with physical evidence: that he presented false documents to the prosecutor with the purpose to mislead the prosecution of the *Watters* case [see footnote 2]. Count II charged that Anding concealed an offense: that he conferred money on George Hall to induce his noncooperation in the prosecution of the *Watters* case. Count III charged that Anding tampered with a witness: that he induced the absence of witness George Hall from the *Watters* prosecution by the conferral of money. The court released the defendant from the charge of Count I. The defendant thereupon moved for a mistrial as to Count II and Count III, or alternatively, for a continuance, on the ground that the charge of tampered evidence was recited to the panel from which the jurors selected to try the case and was elaborated during the voir dire. The defendant contends that these allusions impressed the jurors indelibly, and so prejudiced the verdict.

The recitals to the jury panel concerning Count I, in fact, came not from the prosecutor, but from defense counsel and the court. The comment by the defense counsel was nothing more than a sketch of the charge in the official jargon of Count I. The comment by the trial judge came in the form of an instruction to inform the jury that Count I was no longer for their consideration, and otherwise to meliorate the reference to that charge by counsel during voir dire:

This morning, the state dismissed Count I of the Information which charged the

defendant with tampering with physical evidence, so that charge is no longer in the case, and in that connection, I am instructing you that you are to disregard any statements made by the court or by counsel in connection with the process of selecting the jury that related to Count I.

The defendant contends that the allusion to Count I during voir dire insinuated to the jury that another crime was committed by the defendant, a prosecution tactic both unfair and prejudicial.

The argument of prejudice the defendant offers—that the charge of offense [in this case, that Anding tampered with physical evidence] the prosecutor knows the proof will not sustain, but exploits before a jury to insinuate guilt of other charges on trial, and then terminates by nolle prosequi rather than by verdict of the jury—was fully considered and rejected in *State v. Brooks*, 551 S.W.2d 634 (Mo.App.1977). In that case, the defendant was charged with robbery and assault, and *at the conclusion of all the evidence* the prosecutor entered a nolle prosequi on the assault charge. The defendant there, as does Anding here, argues that the formal charge of assault [here, tampered evidence] was merely a guise to inflame the jury on the other charge the State seriously intended to prosecute. The court denied the motion for mistrial, l.c. 647:

> [W]e cannot conclude that the trial court was misled or erred in not granting appellant's motion for a mistrial at the conclusion of all the evidence and after the State had entered its nolle prosequi as to the assault charge. It is well established that the prosecutor has the sole and exclusive discretion concerning whether or not to enter a nolle prosequi. *State v. Smith*, 363 Mo. 1235, 258 S.W.2d 590, 593 (banc 1953). The prosecutor even has the discretion to dismiss at the close of the evidence. *State v. Turner*, 458 S.W.2d 280, 281 (Mo.1970).

The nolle prosequi to the tampered evidence charge was entered at the very outset of the trial [and not after the full and graphic evidence was presented, as in

*Brooks* ], and even before those selected from the venire assumed the function of jurors. The allusions to the tampered evidence count were ineluctable incidents of the prosecutions, and the law assumes that the subsequent nolle prosequi of that charge was an act of duty and discretion, and not of malevolence.

■■■■ The defendant was not prejudiced by the nolle prosequi, since "it meant that he could be convicted and sentenced on only one charge instead of two." *State v. Turner*, supra, l.c. 282. [The other two counts against Anding were submitted in the alternative, and hence the conviction returned by the jury on Count III was an acquittal of the charge in Count II]. The instruction by the court that the jury disregard any statements by court or counsel on Count I was a sufficient remedy to ensure that the trial remained a fair prosecution. The request for mistrial was properly refused. *State v. Martin*, 624 S.W.2d 879, 882[4–7] (Mo.App.1981).

■■■ The defendant contends also that the amendment of the Information consequent upon the nolle prosequi created a surprise and was ground for a continuance. The prosecutor requested, and was granted, leave to renumber the two counts which remained: Count II became Count I, and Count III became Count II. [Anding was convicted of Count II, former Count III]. The nolle prosequi and renumbered offenses, Anding contends, upset the predesigned trial strategy, preparations, and order of presentation of evidence. In the words of the brief, the dismissal of Count I "rendered a large part of defense counsel's extensive trial preparation useless." There is no contention that the defendant was not prepared to defend against all three counts when the trial commenced. It is difficult to imagine, therefore, how an action of the prosecution which relieves the defense from the presentation of evidence on one count can be prejudicial as to those which remain. The defense on the counts which remained could not have been altered by mere renumbers, as Anding argues. The alternative motion for continuance before

the judge at the trial gave no reason, other than those presented for mistrial. The cases Anding cites are those which deal with surprise and prejudice from amendment of the Information. Here there was no amendment within the sense of Rule 23.08, but merely renumbered counts. Were we to assume the deletion of Count I was an amendment within the rule, it could not have engendered the need for "further time to prepare his defense." Rule 23.08. The opportunity to defend Count II and Count III, already allowed and exploited, and the preparations already made, could not have been impaired by the dismissal of the separate charge. *State v. Belleville,* 362 S.W.2d 77, 80[3, 4] (Mo.App.1962). The denial of the motion for continuance was a proper exercise of discretion. *State v. Winston,* 627 S.W.2d 915, 917[1, 2] (Mo.App.1982).

The judgment is affirmed.

All concur.