STATE of Missouri,
Plaintiff-Respondent,

v.

Ricky Lee GRUBBS,
Defendant-Appellant.

No. 68230.

Supreme Court of Missouri,
En Banc.

Feb. 17, 1987.

Rehearing Denied March 17, 1987.

Janet M. Thompson, Columbia, for defendant-appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HIGGINS, Chief Justice.

Ricky Lee Grubbs was convicted by a jury of capital murder, section 565.001, RSMo 1978 (repealed effective 10–1–84), and sentenced to death, section 565.032, RSMo Cum.Supp.1984. Judgment was rendered accordingly.

Appellant charges the trial court erred: in failing to strike for cause venireman Robert Hooper; in failing to declare a mistrial *sua sponte* for a statement made in the prosecutor's closing argument; in overruling defendant's motion for directed verdict because there was no evidence of premeditation or deliberation; in failing to declare a mistrial *sua sponte* when the State on cross-examination elicited information from two defense witnesses in violation of the mandatory statutory prohibition against the disclosure of juvenile records; and in overruling defendant's objection to the State's cross-examination of defendant's aunt and sister utilizing information contained in the report of a psychiatric examination taken pursuant to chapter 552, RSMo. He charges further: that the trial court should not have permitted the State's disclosure of a substantial history of serious assaultive criminal convictions by defendant because there was insufficient evidence of such; that the trial court should not have permitted the jury instructions to set forth certain aggravating circumstances to the crime which defendant believed were unsupported by the evidence; that the sheriff should not have been allowed to testify that a statement was taken from defendant's brother, Randy Grubbs, because the testimony constituted inadmissible hearsay; and, that the imposition of the death penalty by the jury was excessive and disproportionate to punishment imposed in similar cases. Affirmed.

The evidence showed that the victim, Jerry Russell Thornton, lived in a trailer in the town of Miner in Scott County, Missouri. On the afternoon of Wednesday, February 15, 1984, Ricky Lee Grubbs and his brother, Randy Grubbs, went to Thornton's trailer. Ricky Grubbs was acquainted with Thornton, having been at his trailer once before; Randy Grubbs had previously worked for Thornton. Both brothers wore gloves while in the trailer. When they left the trailer Thornton was dead. When the body was discovered, its hands and feet were found bound with neckties. The victim had suffered massive injuries to his upper torso, including thirteen broken ribs and a cracked sternum; a laceration of the liver and damage to the small intestine; abrasions and lacerations on the face; a broken nose and a brain hemorrhage. An expert witness testified that the victim was alive when the trauma was inflicted to his abdomen.

Defendant testified that he and his brother had been drinking when they went to the trailer. Although they entered the trailer with Thornton's permission, Thornton, who had been drinking heavily, told defendant he did not like him and wanted him to leave. Defendant stated that when the victim came toward him he became scared and struck the victim repeatedly. After Thornton had fallen to the floor, defendant and Randy Grubbs "hog-tied" Thornton with neckties. Defendant stated that he cut Thornton's throat but did not know where he obtained the knife. The forensic pathologist who conducted the autopsy testified that Thornton died after his lungs filled with fluid from shock.

Approximately thirty dollars and some food stamps were taken from the victim's trailer. The next day defendant and his brother returned to the trailer in order to set it afire and destroy the evidence. Late that evening, the fire department was summoned to put out the fire and Thornton's body was discovered.

### I.

Appellant argues that the court should have sustained his motion to strike venireman Robert Hooper and the failure to do so violated his constitutional right to an impartial jury. At voir dire, Hooper was asked by defense counsel, Kevin Curran, whether he believed that the appropriate punishment for capital murder was death; he responded affirmatively. Counsel moved to strike Hooper for cause and the motion was denied. The venireman was later removed by peremptory strike.

The relevant examination of venireman Hooper follows:

MR. CURRAN: Does anyone feel that a premeditated killing, someone guilty beyond a reasonable doubt of capital murder, premeditated, intentional killing, that the death penalty is the only appropriate punishment?

\* \* \* \* \* \*

MR. CURRAN: Okay, thank you. Were there any other hands on that row? Is there anyone who feel that they would just—they're just sure of automatically

imposing it, they would more likely than not impose the death penalty? You're Mr. Hooper, correct?

VENIREPERSON HOOPER: Right.

MR. CURRAN: What's your position? Maybe this is a better way of doing it. What's your position?

VENIREPERSON HOOPER: Capital murder punishment starts with death and it should be given reasons to me to consider the lesser sentence.

Later in the examination Mr. Hooper expressed his intention to follow the directions of the court.

MR. CURRAN: Okay, well, you've heard if you get to the point where you convict Mr. Grubbs of capital murder, you're going to have the two punishments in front of you; right?

VENIREPERSON HOOPER: Right.

MR. CURRAN: With regard to those punishments, what are you going to do?

VENIREPERSON HOOPER: I would consider them both.

MR. CURRAN: All right. Are you saying to me, though, that you're more likely to give the death penalty?

VENIREPERSON HOOPER: Right.

MR. CURRAN: Unless something's shown to you to not give it, would that be right? Somebody would have to prove to you a reason not to give it?

VENIREPERSON HOOPER: Right

MR. CURRAN: Would that be right?

VENIREPERSON HOOPER: Right.

MR. CURRAN: Now, if the Court's instruction's contrary to your feeling the way it should be, what are you going to do?

VENIREPERSON HOOPER: I have to go the way the Court tells me to do it.

The State contends that the court did not err in denying the motion to strike because Hooper stated that he was able to follow the instructions of the court relating to punishment. The State asserts that defense counsel put the question in a confusing and misleading manner when he asked the panel for personal feelings whether life was an "appropriate" punishment for capi-

tal murder or whether they would personally consider one punishment over the other.

In *State v. Smith*, 649 S.W.2d 417 (Mo. banc 1983), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983), the venireman was presented with a similar situation. In that case venireman Kraft was asked whether he thought "the death penalty *ought* to be automatic in a case of capital murder; so that if someone is convicted of the crime of capital murder the only punishment available *ought* to be capital punishment or death in the gas chamber." *Id.* at 424. He was further asked "[w]ould it be your statement, then, Mr. Kraft, that if you deliberated on the jury and if you found Jerry Smith guilty of Capital Murder, that you *would* automatically vote for the death penalty?" *Id.* The court held that viewed in its context, venireman Kraft was not stating that he could not follow the dictates of the court. The court pointed out that no alternative to capital punishment was mentioned in defense counsel's questions, and it is reasonable to infer that the venireman was responding to the hypothetical presented by counsel. The venireman later stated, upon inquiry, that he would be able to consider both life imprisonment and the death penalty punishment alternatives.

Appellant asserts that this case is similar to *State v. Stewart*, 692 S.W.2d 295 (Mo. banc 1985). In *Stewart*, defense counsel asked venirewoman Thompson if she would be "more apt to think (the defendant) was guilty if he didn't testify...." Thompson replied affirmatively. On further questioning Thompson again stated that "[i]f I were in the chair myself, I would like to be able to speak in my defense...." *Id.* at 297. Counsel for both sides repeatedly advised Mrs. Thompson that the burden of proof was on the State to prove that the defendant was guilty and that the defendant need not testify; however, when asked whether she would hold it against the defendant if he refused to testify she replied, "It depends. He has to have the opportunity to do so, and if it were I and things looked against me, I would choose to do so. You get what I mean?" *Id.* at 298. No questions were asked by the trial court and the

court refused to sustain defendant's challenge for cause.

This court reversed and remanded the cause for a new trial. It was noted that Mrs. Thompson never unequivocally stated that she would not draw any inference of guilt from defendant's failure to testify; she once stated that she would tend to find the defendant guilty if he failed to testify. *Id.* at 299. Consequently, it was held that the trial court should have sustained defendant's challenge for cause and that it was reversible error to fail to do so. *Id.* at 299.

■ Venireman Hooper is to be distinguished from venirewoman Thompson. He responded specifically to defense counsel's questions, and he stated his willingness to follow the directions of the law once the law was explained to him when he replied to counsel's questions, "I have to go the way the Court tells me to do it." After Mr. Hooper's unequivocal statement that he could follow the dictates of the court it became unnecessary for the trial court to pursue the matter further. Twenty-three other veniremen were stricken for cause at the request of the defendant on the same rationale when they were asked to speculate as to the law. The trial court did not abuse its discretion in failing to strike venireman Hooper for cause.

## II.

■ Appellant argues that the trial court erred in failing to declare a mistrial *sua sponte* where, in the State's closing argument, in the punishment phase, the prosecutor told the jury to ignore the element of deliberation set out in the instructions. Appellant asserts that the prosecutor's statement to the jury not to "pay any attention to all this coolly and fully reflecting and that kind of thing" was decisive to the ultimate determination of the case.

No objection was made to the prosecutor's statement and review is limited to plain error. Rule 29.12. Respondent asserts that the statement taken in context was not a request for the jury to ignore the element of deliberation, but was made to

persuade the jury that the language "reflected ... coolly and fully" was not to be read hypertechnically to imply that deliberation could not occur in a short period of time. Prior closing argument by the prosecutor follows:

> Folks, don't get sidetracked with all these legal technicalities in the form of what constitutes premeditation and deliberation. Premeditation can take place in a snap (snaps fingers once). It doesn't have to be minutes, days, weeks, months, anything like that. Ricky Grubbs thought about what he was going to do. His action is are reflected in those pictures, by beating the man, by tying him with the neckties, by slitting his throat and then the next night going back to the trailer and setting it on fire to cover it up. He didn't want to be caught.

The statement attacked by appellant when taken in its context would not lead the jury to believe that the element of deliberation was not an essential element of the crime.

### III.

Appellant asserts that the trial court should have granted a motion for directed verdict because there was no evidence of premeditation or deliberation. He argues that although the evidence showed that defendant was involved in the commission of the homicide, there was no showing that he thought for any length of time about killing the victim or that the act was done in a cool state of mind.

■ Defendant was charged and convicted of section 565.001, RSMo 1978, *supra*, which provided that "[a]ny person who unlawfully, willfully, knowingly, deliberately, and with premeditation kills or causes the killing of another human being is guilty of the offense of capital murder." The willfulness, deliberation and premeditation required for a conviction may all be inferred from and established by the circumstances surrounding the homicide. *State v. Davis*, 400 S.W.2d 141 (Mo.1966), *cert. denied*, 385 U.S. 872, 87 S.Ct. 142, 17 L.Ed.2d 99 (1966); *State v. Clark*, 494 S.W.2d 26 (Mo. banc 1973); *State v. Nelson*, 514 S.W.2d 581 (Mo.1974).

In *State v. Lieberknecht*, 608 S.W.2d 93 (Mo.App.1980), the definition of premeditation and deliberation was reiterated.

" 'Premeditation means thought of beforehand for any length of time, however short.' [citations omitted] This simply means the defendant thought about what he was about to do before he did it." *State v. Marston*, 479 S.W.2d 481, 484[6] (Mo.1972). "Deliberation occurs when the defendant considers that matter of taking another's life in a 'cool state of the blood,' or with a 'cool and deliberate state of mind.'" *State v. Marston, Id.* at 484[4].

"It is not necessary that the actor brood over his actions for an appreciable period of time." *State v. Armbruster*, 641 S.W.2d 763, 765 (Mo.1982).

■ Defendant admitted that he hit the victim and cut his throat but says also that he simply reacted to the victim's threats of physical harm and that there was "no harm intended." The evidence shows, however, that the victim's hands and feet were bound with neckties; his throat was cut; he had thirteen broken ribs and a cracked sternum, as well as damage to his small intestine and liver. Expert testimony was that the injuries to the victim's chest, abdomen and neck were all inflicted while he was still alive. Gloves belonging to defendant and his brother were discarded in the victim's trailer; they burned the trailer later in an attempt to conceal the evidence. In addition, cash and foodstamps were taken from the trailer. From this evidence a jury could reasonably infer that defendant and his brother engaged in their purpose with premeditation and deliberation.

### IV.

■ Appellant argues that the trial court should have *sua sponte* declared a mistrial during the punishment phase when the prosecutor's cross-examination of defendant's aunt and sister elicited that defendant had been in trouble with the law from the age of ten or twelve. Appellant asserts that this was a reference to his juvenile record in violation of section 211.271.3, RSMo 1986. The statute reads:

After a child is taken into custody as provided in section 211.131, all *admissions, confessions, and statements by the child to the juvenile officer and juvenile court personnel* and all *evidence* given in cases under this chapter, as well as all *reports and records* of the juvenile court, are not lawful or proper evidence against the child and shall not be used for any purpose whatsoever in any proceeding, civil or criminal, other than proceedings under this chapter (emphasis supplied).

The state contends that no references were made to defendant's "juvenile record"; and that the witnesses, relatives of defendant, simply testified about his behavior from their personal knowledge of him as a child. The prosecutor elicited information concerning the witnesses' knowledge of defendant's truancy from school and his troubles with the law at an early age.

During the state's cross-examination of Martha Grubbs, defendant's aunt, in the penalty phase of the trial, the following exchange took place:

Q. Isn't it true that Ricky started skipping school when he was about fourth or fifth grade?

A. Yes.

Q. He quit going to school then?

A. Pardon?

Q. He quit going to school, started skipping school at an early age?

A. Yes, he was in trouble.

Q. When did he start getting in trouble?

A. I don't know. I guess about ten or twelve years old.

Q. What kind of trouble was he in when he was ten or twelve?

A. Well, he was, you know, he was in, like out stealing.

Q. So that started at an early age?

A. Yes.

Later, during the cross-examination of Wanda O'Donnell, defendant's sister, the following exchange took place:

Q. Isn't it true that Ricky got into quite a bit of trouble as a young man?

A. I guess....

Q. Well, he disregarded school at an early age?

A. I guess so.

Q. And he got in trouble with the law at an early age?

A. Yes.

The exchange between the prosecutor and the witnesses reveals no violation of the statute. This case does not compare to the cross-examination of the character witness in *State v. Richardson*, 364 S.W.2d 552 (Mo.1963). In *Richardson*, the defendant alleged that the prosecutor violated the statute by asking the character witness whether he knew that the defendant had been made a ward of the juvenile court and had been sent to a juvenile facility. Here, only general statements concerning truancy and stealing were elicited; no specific incidents of juvenile court proceedings or evidence given in a proceeding were adduced. Appellant concedes that no objection to the testimony was made at trial; therefore, the contention is reviewable only for plain error. Rule 29.12. No manifest injustice is present.

In addition, appellant argues that the prosecutor's cross-examination of defendant's aunt and sister violated his right against self-incrimination because the State's attorney used information gleaned from a psychiatric report on defendant in formulating his questions. Appellant argues that section 552.020.12, RSMo 1986, bars the State's attorney from using information gleaned from psychiatric evaluations taken pursuant to that chapter.

The appellant miscontrues the statute. Section 552.020.12 provides that "[n]o statement made by the accused in the course of any examination ... shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding...." The attorney was simply questioning the witnesses on matters concerning their personal knowledge of the defendant. There is no allegation that either the attorney or the witnesses repeated statements made by defendant during his psychiatric evaluation or that the report was

admitted into evidence. Section 552.020.6 states that a copy of the psychiatric report must be provided to the prosecutor in all cases. The attorney may have gleaned information from the report as well as from other information received on discovery, and would be free to use this information in formulating trial strategy.

## V.

■ Appellant asserts that the trial court erred in failing to remove certain aggravating circumstances from the consideration of the jury. He argues that the court should not have submitted Instruction No. 18 to the jury in the penalty phase of the trial because there was insufficient evidence that defendant had a substantial history of serious assaultive convictions. Instruction No. 18 permitted the jury to consider the aggravating circumstance of defendant's prior convictions for four counts of burglary and stealing, a conviction of theft of property and armed robbery. Appellant points out that only one of these is a serious assaultive crime which is permitted to be submitted to the jury under section 565.012.2(1), RSMo Supp. 1983 (repealed, effective 10–1–84, now 565.032.2(1) RSMo 1986).

Aggravating circumstances other than those enumerated in the statute may be presented to the jury. Section 565.006.2, RSMo Supp. 1983 (repealed effective 10–1–84), provides that during the penalty phase of a capital murder trial the jury "shall hear additional evidence in extenuation, mitigation, and aggravation of punishment, including the record of any prior criminal convictions...." Note 3 to MAI–CR 2d 15.42, the pattern for Instruction No. 18, quotes section 565.006.2 and states that the aggravating circumstances presented are not limited to those "specifically directed to death penalty issues." They need not be assaultive crimes so long as the crimes fall within the constraint of the statute, any prior criminal conviction. Consequently, appellant's seven prior felony convictions were properly submitted as non-statutory aggravating circumstances as authorized under section 565.006.2 and MAI–CR 2d 15.42.

## VI.

■ Appellant argues there was insufficient evidence to support the submission of Instruction No. 17. The instruction sets forth the aggravating circumstances that (1) defendant committed the offense of capital murder for the purpose of receiving money or any other thing of monetary value, (2) defendant committed the offense to avoid, prevent, or interfere with a lawful arrest, and (3) the homicide was outrageously or wantonly vile, horrible, or inhuman in that it involved torture or depravity of mind. The evidence previously recited demonstrates that a reasonable juror could find these aggravating circumstances to be present.

## VII.

■ Appellant argues the trial court erred in allowing Sheriff Ferrell to testify over objections that a statement was taken from defendant's brother, Randy Grubbs, and about the sheriff's subsequent actions in placing defendant under arrest. Appellant asserts that such statements violated his right to confrontation of the witnesses against him, as guaranteed by the sixth amendment to the United States Constitution and article 1, section 18(a) of the Missouri Constitution because the testimony was inadmissible hearsay. Sheriff Ferrell testified that he talked to Randy Grubbs after he took him into custody, and that Randy Grubbs made a statement. He further stated that defendant was sought and placed under arrest. Appellant asserts the inference to be drawn from the sheriff's testimony is that Randy Grubbs implicated defendant in the statement, and, because of that statement, defendant was placed under arrest. Appellant argues that the State was able, in effect, to adduce the testimony of a co-actor implicating defendant without making that co-actor subject to the rigors of cross-examination in order to determine his reliability.

The rule against hearsay excludes in-court testimony of an extrajudicial statement offered to prove the truth of the

matters asserted therein. *State v. Harris*, 620 S.W.2d 349 (Mo. banc 1981); *State v. Walker*, 484 S.W.2d 284 (Mo.1972). The rule serves to "reject assertions offered testimonially, which have not been in some way subjected to the test of cross-examination." *State v. Anding*, 689 S.W.2d 745 (Mo.App.1985). At a bench conference initiated by defense counsel, the trial court instructed the prosecutor to exclude the contents of Randy Grubbs' statement from the sheriff's testimony. Consequently, at trial the only reference was that Randy Grubbs had made a statement.

Courts have permitted testimony which simply aids in accounting the events in a coherent form. In *State v. Bannister*, 680 S.W.2d 141, 146–147 (Mo. banc 1984), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1879, 85 L.Ed.2d 170 (1985), evidence was presented of an incident which occurred after the crime but before the defendant was apprehended. The court held that although the challenged incident constituted evidence of other crimes, it was admissible to "complete the account of the murder presented by the State." *Id.* at 147. Nor was defendant prejudiced by the testimony. Appellant argues that the reference to Randy Grubbs' statement could lead the jury to believe that Randy Grubbs had implicated the defendant in the crime. Irrespective, however, of whether defendant was implicated, defendant, himself, confessed to killing Jerry Thornton. He claims only that the charge should have been manslaughter rather than murder; the identity of the murderer is not in question.

## VIII.

■ Appellant asserts that imposing the death penalty in this case is excessive and disproportionate to similar cases, and thus in violation of the eighth and fourteenth amendments to the United States Constitution. Appellant enumerated mitigating factors which were considered by the jury during the penalty phase of the trial as required by the United States Constitution, *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978): that defendant committed the homicide one day after his divorce became final and less than one month after his mother died; that defendant stated that he had been drinking on the day of the offense and was drunk at the time; that the victim had been drinking heavily as evidenced by his blood alcohol content of .458 or .450; and, that defendant stated that Thornton precipitated and contributed to defendant's conduct.

As previously indicated the jury could, and did, find the following aggravating circumstances beyond a reasonable doubt: that the defendant murdered the victim for the purpose of receiving money or other things of monetary value; that the murder involved torture and depravity of mind and the results were outrageous, horrible, and inhuman; and that the murder was committed for the purpose of preventing his lawful arrest. The jury further noted the defendant's seven prior felony convictions and recommended the death penalty.

Under independent and mandatory review, and after examining other cases in which the death penalty was imposed and giving consideration to both this crime and this defendant, § 565.014.3; *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), neither excessiveness nor disproportionality taints the sentence in this case. For similar cases, see *State v. Jones*, 705 S.W.2d 19 (Mo. banc 1986); *cert. denied*, —— U.S. ——, 106 S.Ct. 3286, 91 L.Ed.2d 574 (1986); *State v. Battle*, 661 S.W.2d 487 (Mo. banc 1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984); *State v. LaRette*, 648 S.W.2d 96 (Mo. banc 1983), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983), *reh'g denied*, 464 U.S. 1004, 104 S.Ct. 515, 78 L.Ed.2d 702 (1983); *State v. Mercer*, 618 S.W.2d 1 (Mo. banc 1981), *cert. denied*, 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981).

The judgment is affirmed.

BILLINGS, DONNELLY, WELLIVER, ROBERTSON and RENDLEN, JJ., concur.

BLACKMAR, J., concurs in separate opinion filed.

BLACKMAR, Judge, concurring.

I concur because I cannot distinguish this case from *State v. Jones*, 705 S.W.2d

19 (Mo. banc 1986). The affirmance appears to be within the standards this Court has set.

We should recognize that, although § 565.035, RSMo Supp. 1983, (reenacted in 1984 substantially without change) enjoins us to "consider the punishment ..." and to determine "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases ...," there is in fact very little proportionality review at the appellate stage. The test rather seems to be the same as the usual test in appealed cases—that is, whether any error has been demonstrated. If there is none, affirmance seems to go as of course.

This case seems to have arisen out of a drinking session. The killing was shocking and senseless, but numerous life sentence cases are reported in which the ultimate punishment is much more appropriate than in this case [1] (if, indeed, we must depart from the practice of nations who follow the western tradition [2] in exacting the death penalty). The defendant had numerous convictions, but none for major offenses. His is an unlikely selection for the death sentence, when some juries assess it and some do not.

I am also concerned about the statutory aggravating circumstances found by the jury. I am aware of nothing in the record to support the finding that the defendant killed "for the purpose of preventing his lawful arrest." The fact that the defendant and his brother wore gloves in February, and the fact that money and food stamps were missing (but not found on the defendant), provide, at the most, scanty support for the assertion that the killing was committed "for the purpose of receiving money or other thing of value." Only the "outrageously or wantonly vile" circumstance seems supported by the decisions of this Court. Were the point an open one, I would hold that it is prejudicial error to submit to the jury an aggravating circumstance which is not supported by the record. Such a submission suggests to the jury that it may consider the unsupported circumstance in reaching its conclusion on punishment. But our decisions are otherwise, and the Supreme Court of the United States has not disturbed our holdings.[3]

Because of the force of our controlling decisions, I concur.

1. *State v. Canterbury,* 708 S.W.2d 662 (Mo. banc 1986); *State v. Engleman,* 634 S.W.2d 466 (Mo. 1982); *State v. Turner,* 623 S.W.2d 4 (Mo. banc 1981); *State v. Baskerville,* 616 S.W.2d 839 (Mo. 1981); *State v. Downs,* 593 S.W.2d 535 (Mo. 1980); *State v. Weatherspoon,* 716 S.W.2d 379 (Mo.App.1986); *State v. Rodden,* 713 S.W.2d 279 (Mo.App.1986); *State v. Williams,* 678 S.W.2d 845 (Mo.App.1984); *State v. Laws,* 668 S.W.2d 234 (Mo.App.1984); *State v. Bashe,* 657 S.W.2d 321 (Mo.App.1983).

2. Without having done extensive research, I recall relatively recent reports of executions in Iran, Pakistan, China, Singapore, Saudi Arabia, Nigeria, South Africa, and Franco's Spain.

3. *State v. Kenley,* 693 S.W.2d 79 (Mo. banc 1985), *cert. denied* — U.S. ——, 106 S.Ct. 1500, 89 L.Ed.2d 900 (1986); *State v. Johns,* 679 S.W.2d 253 (Mo. banc 1984), *cert. denied* 470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985); *State v. LaRette,* 648 S.W.2d 96 (Mo. banc 1983); *cert. denied* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983); *State v. Mercer,* 618 S.W.2d 1 (Mo. banc 1981), *cert. denied* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981). *See Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).