STATE of Missouri, Respondent,

v.

John BYRD, Appellant.

No. WD 33250.

Missouri Court of Appeals,
Western District.

Feb. 1, 1983.

John B. Schwabe and Glenn Edward Easley, Columbia, for appellant.

John Ashcroft, Atty. Gen., William K. Haas, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P.J., and PRITCHARD and DIXON, JJ.

PRITCHARD, Judge.

By verdicts of a jury, appellant was convicted (Count I) of the Class C felony of burglary in the second degree, § 569.170, RSMo 1978, and (Count II) the Class A misdemeanor of stealing, § 570.030, RSMo 1978, and in accordance with the verdicts, the trial court sentenced him to five years in the Division of Corrections, and one year in the county jail, to be served concurrently, on the respective convictions.

Appellant first says that the trial court erred in delaying his motion for judgment of acquittal as to Count I because there was no evidence that he knowingly entered unlawfully a building at 704 University Village, Columbia, Missouri, *in that:* (A) there was no evidence of forced entry; there was no objective evidence to the effect that it was readily discernible whether or not the (entered) laundry room portion of the building was open to the public; and there was no evidence that appellant denied a lawful order not to enter personally communicated to him by the owner of the premises or by another authorized person. Thus, appellant summarizes, the elements of the crime of burglary in the second degree were not proved.

The evidence is this: Mrs. Jane Frazier lived in Apartment G of building 703 of University Village, Providence and Stewart Roads in Columbia, Missouri. Her apartment window faces a laundry room in building 704, and a window of the laundry room faces building 703. At about 2:15 a.m., April 28, 1981, Mrs. Frazier heard noises outside her apartment window, and she went to her window to see what it was. She saw three men walk into the laundry facility, flip on its light, and proceed to take the change box out of the dryer and dump its contents into a tan bag, which looked like a bank bag. Mrs. Frazier's apartment light was not on at the time, and she was able to observe the three men in the laundry room. A shorter man with kinky, fuzzy hair was standing at the window looking out. The man holding the bag was around six feet tall, wearing a black shirt, and had a moustache. She identified appellant in court as being that man, but she could not identify the third man, not having seen his face. Mrs. Frazier called the police, and observed appellant later in front of her apartment in the custody of the police. She had observed the men in the laundry room from her apartment window, 30 to 50 feet away, for 30 seconds to a minute.

Ann Warner, a University of Missouri police officer, was dispatched to University Village at 2:18 that morning. She saw two persons walking near building 705 who turned around and hurried away. She radioed another officer and then came upon the scene where men had been detained, appellant being one who was next to a Ford Bronco. Officer Warner observed a beige bank bag on the floor behind the driver's seat. Appellant was the one wearing dark clothing. Officer Monticelli chased and stopped one man, who was about five feet eight inches tall, had fuzzy hair, and was wearing a white T-shirt and tan pants. He saw the other man enter a 1979 Ford Bronco, and asked him to step out of it. That person was identified as appellant. Monticelli also observed a beige money bag behind the driver's seat in the vehicle, and when he later obtained a search warrant for the vehicle he found $99.25, all in quarters, in a bag, a lock-picking took, a tool case, another lock pick, and money wrappers.

Officer Turner also observed appellant in Monticelli's custody and identified him in court. Mrs. Frazier observed appellant in the officer's custody from about 70 feet away on that night.

Photographs of the laundry room in question show it to have a solid door, with lower ventilation louvre, and a sign, "Please Keep Door Shut!" There are windows on two sides of the room, which open with cranks outward. Inside there is located the coin-operated laundry equipment. There is no

sign on the door limiting access to any persons, and quite apparently, it was unlocked at the time Mrs. Frazier saw the three men enter it.

Semmons Service Company services the coin-operated equipment at the University Village. Its Kent Finlay takes the money, quarters only being used in the dryer, out of the machines twice a month. He testified that the laundry room is for the use of people in building 704. [Mrs. Frazier said that only the people living in building 704 have permission to be in its laundry room.] Finlay further testified that a circular key is used to open the coin box of the dryer, and he discovered at about 7:00 a.m., April 28, 1981, that the coin box in the laundry room was empty. The money had last been picked up on April 17th. Semmons Company owned the machines and the money therein.

Section 569.170 (L.1977, S.B. No. 60, p. 662, § 1, eff. Jan. 1, 1979), is: "1. A person commits the crime of burglary in the second degree when he knowingly enters unlawfully or knowingly remains unlawfully in a building or inhabitable structure for the purpose of committing a crime therein. * * *."

Section 569.010(8) had this definition of terms contained in § 569.170, supra: " 'Enter unlawfully or remain unlawfully', a person 'enters unlawfully or remains unlawfully' in or upon premises when he is not licensed or privileged to do so. A person who, regardless of his purpose, enters or remains in upon premises which are at the time open to the public does so with license and privilege unless he defies a lawful order not to enter or remain, personally communicated to him by the owner of such premises or by other authorized person. A license or privilege to enter or remain in a building which is only partly open to the public is not a license or privilege to enter or remain in that part of the building which is not open to the public."

As to whether appellant had a license or privilege to enter the laundry room of the apartment complex, as, for example, being a tenant thereof, this fur-

ther evidence was presented. At the time of his arrest, appellant told the officer that his identification was inside a black leather jacket inside the (Bronco) vehicle. An officer retrieved the identification, appellant's driver's license, State's Exhibit 15, issued 1–18–80, expiring 12–6–82, showing his address as R.R. 1, Box 244, Troy, Ill. 62294. Appellant corrected his address on the license to the officer to be Pocahontas, Illinois, where he was from. The license plate on the vehicle was Illinois, No. 383057 (but it was not shown to be owned by appellant). This evidence of appellant's address at the time of his arrest is important to a finding by the jury that he was not a tenant of the apartment complex at University Village, and thus upon *that status,* he was not licensed or privileged to enter its laundry room. The factual question remains as to whether the laundry room was "open to the public" so as to give thereby to appellant a license or privilege to enter it "unless he defies a lawful order not to enter or remain, personally communicated to him by the owner of such premises or by other authorized person". There was no such message on the door of the laundry room, and of course, no one advised appellant of any restricted use of the laundry room. But that is not fatal to the state's case. Clearly, this was an apartment complex, with a provided laundry room for the use of its tenants only—a well known practice in these times of apartment dwelling, wherein the general public is not invited to use laundry facilities. The physical facility is quite different than those all night, lighted and automated laundry, commercial businesses which are clearly open to the public. Here, it was open and obvious to appellant himself that the laundry room was a part of the apartment complex for the use of its tenants—not a commercial enterprise; that the laundry room lights were off, and that it was 2:15 in the morning when he entered it without any justifiable authority as the jury could find. It is unnecessary to consider the conclusionary statements of Mrs. Frazier and Finlay that the laundry facility was for the sole use of tenants. The state

made a submissible case of appellant's entering a building for the purpose of committing a crime therein.

■ Appellant contends that there was no evidence to convict him of the offense of stealing. The contention overlooks the testimony of Mrs. Frazier that she saw appellant and his accomplice, inside the laundry room, remove the coin box from the dryer and dump its contents into what looked like a bank bag; that the bag was seen on the back floor of the Ford Bronco, and later upon seizure under a search warrant, was found to contain $99.25 in quarters, the coins which operated the dryer; and the next morning Finlay found the coin box of the dryer to be empty, he having taken out money from it about ten days before. This chain of events distinguishes this case from *State v. Goff,* 493 S.W.2d 657, 658 (Mo.App. 1973), where there was no evidence of anything of value located in a vending machine. The jury here could infer that something of value was dumped from the coin box into the bag, later found to contain quarters. The state made a submissible case of stealing.

The dispositive point is that the trial court erred in failing to sustain challenges for cause of certain venire persons. Upon voir dire examination, appellant's counsel told the panel that he would not take the stand in his own behalf and would not offer any evidence in his defense. The panel was then asked, "Now, what I need to ask you is regardless of whatever reason he may have for not testifying, would the fact that he failed to testify or call any witnesses to defend him affect you in any way in arriving at a fair and impartial verdict in this case? Would the fact that he doesn't testify in his own behalf affect you in any way? Yes, Miss Epple? VENIREMAN EPPLE: Just to be real honest, I don't mean it personally or against you, but, yes, it probably would. VENIREMAN DONHAM: I have some problem with that. MR. SCHWABE: Thank you for your honesty. Is there anyone else? Mrs. Burgan? VENIREMAN BURGAN: Yes, it would affect me too. [Venire-person Burgan was excused by the court on its own motion.] VENIREMAN ALMON: It would affect me, but I think I would consider it in spite of it. [Almon then stated to counsel she would make the state sustain its burden of proving appellant guilty beyond a reasonable doubt even though he did not take the stand.] VENIREMAN HULSE: It would raise questions in my mind. MR. SCHWABE: Would that be adverse to the Defendant, I presume? VENIREMAN HULSE: I cannot answer that at this time because I don't know. MR. SCHWABE: Would it raise a question about the Defendant? VENIREMAN HULSE: I'm sure I would wonder why. MR. SCHWABE: Yes, ma'am? VENIREMAN ROBINSON: Dianne Robinson. MR. SCHWABE: Yes, Miss Robinson. VENIREMAN ROBINSON: The only thing that would bother me is why if he feels he is not guilty of the offense, why he does not defend himself and therefore present himself as a—well, present his case. MR. SCHWABE: Would it keep you from being able to render a fair and impartial verdict? VENIREMAN ROBINSON: I don't think it would. I think just the fact that—I know if I felt I were in his place and I knew I was not guilty of it, I would be up there fighting for myself. MR. SCHWABE: Well then, would you feel you would have a preconceived notion about his guilt? Knowing that now, do you have your mind to a certain degree made up? VENIREMAN ROBINSON: I don't believe so, no. MR. SCHWABE: But you do feel that if it were you, you would get up and testify if you weren't guilty? VENIREMAN ROBINSON: That's my personal feeling. MR. SCHWABE: And you believe that right now? VENIREMAN ROBINSON: Yes. [Robinson became a juror.] * * * VENIREMAN PETTIGREW: I feel about the same way they do. [Pettigrew became a juror.] VENIREMAN ESTRADA: I feel more comfortable knowing why. I don't know whether that's possible. Why he did not want to testify. * * * VENIREMAN MITCHELL: I have similar feelings. * * * VENIREMAN ROBBINS: I admit to having all the curiosity anybody else does, but I

assume since he has a lawyer, you have explained something and you are going to tell me why he didn't testify. [Counsel then inquired whether anyone disagreed with the propositions that a person is presumed innocent until proven guilty beyond a reasonable doubt, and that people should not have to take the stand in a criminal case if they do not want to, even though they are the defendant.] VENIREMAN VIRNIG: Would you clarify something for me? Are you telling us that he will not be sitting on the stand and be able to be questioned directly about whether or not he participated? MR. SCHWABE: Yes, sir, that is correct. VENIREMAN VIRNIG: He isn't going to? MR. SCHWABE: That is correct, and he will present no evidence in his behalf. Did you have a comment to make? VENIREMAN VIRNIG: Yes, I have trouble with that. * * * VENIRE-MAN ALLEN: I agree. I think I might have a little trouble with that. * * * VE-NIREMEN FOLEY: I have a problem with that too, the same as they do." [Bracketed material here added.]

At the close of the voir dire examination, the trial court asked appellant's counsel if he were going to request MAI–CR 3.76, to the effect that the jury might not consider appellant's failure to testify. [Instruction No. 5 on that subject was in fact given.] The trial court then addressed the panel: "Did you fully understand that the burden in a criminal case is on the State and only on the State to prove any Defendant who is charged guilty beyond a reasonable doubt? Is there anyone who could not follow that principle of law? I take it by your silence that all of you would follow that principle of law. Even those of you who expressed questions in your mind as to why a Defendant would not take the stand, as Mr. Schwabe has announced to you, I have another principle of law that I will recite to you and I want to know if anyone on this panel could not follow that principle of law, because it is extremely important. Under the law a Defendant has the right not to testify. No presumption of guilt may be raised and no inference of any kind may be drawn from the fact that the Defendant did

not testify. That is an instruction of law. Is there any of you who for any reason could not follow that instruction as well as all other instructions of the Court? I take it by your silence that you would all follow that instruction as well as any other of the Court. Would everyone who has heard me raise your right hand, please? All right. Just wanted to make sure. Sometimes we have people that are not hearing and I never know unless I ask you all to raise your right hand. * * *."

█ It should be noted that at the outset and during the voir dire examination appellant's counsel informed the panel explicitly that he would not testify and would not present evidence in his own behalf, and that he had the right not to do so. Counsel also went into the matter of the burden of proof being on the state. It is thus clear that the responses above set forth to the effect that a number of venirepersons would have difficulty with the fact that appellant would not testify (and had a right not to testify), were made with the knowledge of the state's burden of proof, and the presumption of innocence of appellant. In several instances, those responses were equivocal in tending to show a disregard of appellant's constitutional right not to take the stand and incriminate himself, and thus require him to explain his conduct. Note that two venirepersons who expressed doubts about appellant not testifying or presenting evidence served on the jury. He was also forced to expend his peremptory challenges on four other venirepersons who expressed those same doubts. The basic rules are well stated in *State v. Lovell*, 506 S.W.2d 441, 443–444[1–3] (Mo. banc 1974): "A defendant is entitled to a full panel of qualified jurors before he makes peremptory challenges, and the court's discretion in ruling upon challenges for cause to prospective jurors will not be disturbed unless it is so manifestly against the record of the voir dire examination as to show an abuse of discretion. (Citing case.) In exercising this discretion, the decision of the trial court should rest upon the facts stated by the juror with reference to his state of mind

and should not be allowed to depend upon the conclusions of the juror whether he could or would divest himself of a prejudice he admitted to exist in his mind. (Citing case.)" The direct questions of juror Black in that case were held to show that he had doubts about giving defendant a fair trial and that he should have been excused for cause. These further cases bear upon the problem. In *State v. Roberts*, 604 S.W.2d 765 (Mo.App.1980), certain jurors expressed doubts as to the concept of an "involuntary confession" and the court held it was error to fail to dismiss them for cause, saying, page 767[6, 7], "[T]he subsequent general questions to the entire venire as to whether they would follow the instructions of the court, to which no juror responded, did not serve to rehabilitate the challenged veniremen. The decision of the trial court must rest on facts stated by the veniremen and not upon their conclusions that they could be fair and impartial." *State v. Scott*, 482 S.W.2d 727 (Mo. banc 1972), was a case involving venirepersons expressing feelings adverse to defendant for his failure to testify. The court said, page 732, "To summarize, three veniremen said, in substance, that if defendant did not avail himself of his opportunity to testify they would consider this fact and hold it against him. Their attitude toward the possibility he might not testify in his own defense was no doubt that articulated by Mr. Baker: ' * * * if he were innocent he would be glad to testify.' In other words, these three were of the opinion that his failure to testify was a factor weighing against innocence which they could consider in arriving at their verdict." The court told the jury, during the voir dire examination, that under the statute a defendant is not required to take the stand, and if he fails to do so, it is not to be used against him. No instruction was given on the subject. The court, however, held that it was reversible error not to excuse one venireman who expressed the view that he would hold it against defendant if he did not testify. See also *State v. Merritt*, 589 S.W.2d 359 (Mo.App. 1979), where a venireman was asked if he would follow the instruction that defendant has a right not to testify and no inference of guilt could be raised by the fact, replied that he could not say, "for a hundred percent sure whether I would follow it." The court reversed the case stating that the venireman never equivocally denied that the failure of defendant to testify would prejudice him. Here, although the entire panel remained silent upon the advice by the court as to no presumption of guilt could be made by appellant's failure to testify, and that the burden of proof was on the state (and none raised their hands in response to the advice), none were questioned individually as to whether they recanted from their previous statements as to how they would regard appellant's failure to testify or present evidence in his own behalf. The trial court should have sustained the instant challenges for cause. This does not mean that appellant was entitled to discharge of the entire panel of prospective jurors. See *State v. Wilson*, 615 S.W.2d 571, 574[5] (Mo.App.1981). Other asserted errors are not likely to arise on retrial, and need not be considered.

The judgment is reversed and the case is remanded for new trial.

All concur.