**STATE of Missouri, Plaintiff–Respondent,**

v.

**John Paul LEISURE, also known as Paul Leisure, Defendant–Appellant.**

**No. WD 40357.**

Missouri Court of Appeals, Western District.

April 18, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 30, 1989.

Application to Transfer Denied Aug. 1, 1989.

Alvin M. Binder (argued), Jackson, Miss., Richard Sindel, Clayton, for defendant-appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen. (argued), Jefferson City, for plaintiff-respondent.

Before NUGENT, P.J., and SHANGLER and CLARK, JJ., concur.

NUGENT, Presiding Judge.

Defendant John Paul Leisure (hereinafter Paul Leisure) appeals from his conviction of capital murder for his part in the bombing death of James A. Michaels, Sr. The jury returned a sentence of life imprisonment without possibility of parole for fifty years. The defendant charges the trial court with error in refusing to give his proffered jury instructions, in refusing to excuse a juror for cause, in admitting hearsay testimony, in admitting evidence obtained by a federal wiretap, and in failing to order a mistrial following the prosecutor's improper closing arguments. We affirm.

The defendant does not challenge the sufficiency of the evidence to sustain his conviction. Therefore, we only summarize the relevant facts.[1] The state charged Paul Leisure with capital murder as an accessory to the bombing death of James Michaels in St. Louis. The evidence showed that Mr. Michaels led a St. Louis organized crime syndicate composed of persons of Lebanese and Syrian descent and known as the "Syrians." An apparent conflict existed between the "Syrians" and certain Italian–American participants in organized crime. The Leisures were associated with the Syrian faction.

John Ramo and Joe Broderick, two of the participants in Mr. Michaels' murder, testified on the state's behalf. They described Paul Leisure as the leader of a group of men including Ramo and Broderick, David Leisure (Paul's cousin), Anthony Leisure (Paul's brother), Fred Prater, and Charles Loewe. The witnesses described the ultimate goal of the bombing was to gain control of Local 110 of the Laborers Union in St. Louis and to control the Syrian crime faction.

Paul Leisure later participated in the management of Local 42 but did not belong to Local 110. He also owned a towing business, LN & P Tire Service, along with Anthony and David Leisure and Fred Prater. Anthony Leisure held the position of assistant business manager in Local 110 and had originally been slated to succeed Ray Massud as business manager, but shortly before his death from illness, Massud arranged for his son John Massud to succeed him.

According to that arrangement John Massud would control the business affairs of the union and Anthony Leisure, in the newly created position of assistant business manager, would control personnel decisions. At Paul's suggestion Joe Broderick, known for his ability as a street fighter, joined Local 110. He served as an organizer and later as a business agent.

Following Broderick's appointment, however, Anthony saw his influence decline. John Massud soon appointed two other union officials, Vince Giordano and Mike Trupiano, Jr. Then he hired James Michaels, III, the victim's grandson, as an organizer. The Leisures perceived Massud's moves as a violation of the arrangement giving Anthony control over personnel decisions. They also feared that Giordano and Trupiano, relatives of a powerful member of the

---

1. Further description of the facts surrounding the Michaels murder appears in *United States v.* *Leisure,* 844 F.2d 1347 (8th Cir.1988), and *State v. Leisure,* 749 S.W.2d 366 (Mo.1988) (en banc).

Italian crime faction, would increase Italian influence over the union. Their unhappiness with the events at Local 110 increased when they learned that the union's financial problems threatened Joe Broderick's job there. Because Broderick was Anthony's only appointee, that development represented a further threat to his influence at the union.

The group decided to respond to those developments. The Leisures, Broderick, Ramo, and Prater discussed possible victims of retaliation. Massud's close ties with the Italians and the fear of a "war" with the Italians removed Massud as a target. Similar considerations removed Giordano and Trupiano from the list. The group finally decided that by murdering Michaels they would not only enhance their power in the union, but they would also secure leadership of the Syrian organized crime faction. Michaels' part in allowing the man who murdered Leisure's cousin to escape in 1964 provided further motivation for choosing him as a target.

The Leisures originally scheduled Michaels' execution at his favorite breakfast restaurant. Anthony Leisure, Ramo and Broderick planned to enter the restaurant through a side door. Then Leisure and Ramo would shoot Michaels with shotguns while Broderick would prevent interference from the restaurant owner. Paul stayed at the LN & P office to relay information from surveillance of Michaels. The shooting plan ultimately failed because someone locked the side door to the restaurant and prevented a safe avenue for their surprise attack.

Following that failure, the group sought an alternative plan. The testimony indicated that Paul Leisure opposed bombing Michaels because he feared the type of retaliation it would provoke. The majority decided, however, to proceed with the bombing. Their preparation included obtaining the parts for the bomb, assembling it, stealing a car similar to Michaels' to practice attaching the bomb, testing the remote control detonator and conducting surveillance of Michaels to determine where the bombing should take place.

They decided to attach the bomb to Michaels' car while he ate lunch at St. Raymond's Catholic Church.

Fred Prater and John Ramo assembled the bomb. On the day of the bombing Paul remained at LN & P's offices, again coordinating communications. Anthony and David Leisure, Ramo, and Broderick rode in the van used to transport the bomb to the church parking lot. David Leisure attached the bomb to Michaels' car, Ramo drove the van, and Anthony operated the detonator. Because Mr. Michaels' grandson accompanied him to his car, the group had the opportunity to kill them both at once. Anthony Leisure rejected that possibility because Paul Leisure had directed him not to allow the bombing to occur on the church parking lot. A short time later, Anthony succeeded in detonating the bomb as the group followed Michaels down Interstate 55. The blast blew Michaels' upper torso out of the car, killing him instantly. The body struck another car, but Ramo swerved the van and avoided being hit by the debris. He left the highway and drove to Illinois where the group cleaned the van. Over the defendant's objection, the state presented photographs of Mr. Michaels' bloody remains on the highway.

Following the bombing, the group, at Paul's suggestion, attended Mr. Michaels' funeral as a "show of force." Michaels' grandson and brother eventually lost their positions in the union. In meetings with leaders of the Italians, Paul secured an agreement that he would control Syrian affairs, but he would stay out of Italian matters.

About a year later, Paul Leisure suffered severe injuries when a bomb exploded in his car. He presented photographs of those injuries to the jury. Later, federal authorities conducted a court-ordered electronic surveillance of the defendant's residence and LN & P's offices. At trial, the state, over the defendant's objections, presented tapes and transcripts of intercepted conversations. In the tapes, Paul discussed his motives for bombing Michaels and his belief that his own bomb injuries came in retaliation for Michaels' murder.

The state obtained indictments in St. Louis County against Paul, Anthony, and David Leisure, and Charles Loewe for the Michaels' murder and for other crimes not at issue here. In return for their testimony in this and other trials, Ramo and Broderick received sentences for the reduced charge of second degree murder. The instant trial occurred in Buchanan County after the defendant's successful efforts for a change of venue and severance of the other charges and the other defendants.

During voir dire of the venire the following exchange took place between defense counsel Binder and venireman Reichman:

MR. BINDER: ... I want to tell you, there was a jury survey made years ago—not too long ago, where people were asked across the country, do they feel that a defendant should put on a little evidence, if he's accused of a crime. Fifty percent of the people thought he should. And that leads up to this question.

Do any of you feel that my client, because he's charged with this type of crime, should put on a little evidence to show that he's not guilty before we start, you know? Anybody that would feel like that?

UNIDENTIFIED: Such as? I don't know whether I'm following you.

MR. BINDER: That he has an obligation to come forth and put on some evidence to show that he's not guilty since the state has charged him with a crime. Do you feel like he ought to put on some evidence to convince you?

MR. REICHMAN: Testify?

MR. BINDER: Whatever?

MR. REICHMAN: Sure.

MR. BINDER: You think he should?

MR. REICHMAN: Well, sure.

Neither defense counsel nor the state questioned Mr. Reichman any further on that statement. He later stated that his father is a highway patrolman but that his father's involvement in law enforcement would not affect his judgment. The defendant originally advanced Mr. Reichman's law enforcement ties as grounds for his removal from the jury for cause. When the court noted Mr. Reichman's previous remarks about the defendant's failure to testify, defense counsel added that ground to his motion. The court denied the motion stating:

THE COURT: All right. Well, I—In my opinion, those responses were made and, particularly in regard to Mr. Reichman, somewhat out of context, was not understanding the instructions of the court, if the defendant chooses not to testify in the case.

I feel that his overall demeanor and response and attitude as exhibited, throughout the course of the voir dire, was that he would be a fair and impartial juror and that he would follow the instructions of the court.

So I'll deny the request to strike No. 43.

The defendant employed a peremptory strike to remove Mr. Reichman from the jury. The defendant did not challenge three other veniremen who responded that they also expected the defendant at least to present some evidence. At the close of the bench conference on jury selection, the defendant moved to strike the entire panel on the ground that a large proportion of the veniremen had ties to law enforcement personnel. The court denied that motion.

The prosecutor, in his closing argument, mentioned organized crime and referred to Ramo and Broderick as "thugs," and the defendant's responsibility for organizing those "thugs." He also mentioned the use of the LN & P garage as a "chop shop." Defense counsel also referred to the state's witnesses as thugs. He sought to describe their "dishonesty, disloyalty, evil, and jealousy," and referred to them as sunk in a "slimy cesspool of evil." He painted LN & P as a legitimate business.

The jury returned a verdict finding the defendant guilty of capital murder. In the sentencing phase, the jury rejected the death penalty and returned a sentence of life imprisonment without possibility of parole for fifty years. The court entered judgment on that verdict.

In his first point on appeal, the defendant argues that the trial court erred by refusing to give an instruction on the defense of abandonment, a circumstantial evidence instruction, instructions defining premeditation and deliberation, a converse instruction, and an instruction limiting the use of prior inconsistent statements. Only the circumstantial evidence instruction followed Missouri Approved Instructions.

■ The defendant's proposed instruction on abandonment did not follow the substantive law. One who asserts as a defense that he has withdrawn from a criminal enterprise must show that he timely contacted law enforcement officials or that he took other reasonable, positive steps to prevent the crime from being committed. *See* § 562.041.2(3); *State v. O'Neal*, 618 S.W.2d 31, 37 (Mo.1981). MAI–CR2d 2.16 incorporates that requirement. The defendant's proposed instruction did not. A defendant has no right to a jury instruction that misstates the law. *State v. Calvert*, 682 S.W.2d 474, 480 (Mo. 1984) (en banc). The court properly refused the defendant's incomplete and misleading instruction.

■ The defendant cites *State v. Ball*, 654 S.W.2d 336, 340 (Mo.App.1983), for the proposition that the court may properly give a circumstantial evidence instruction even when the state has presented direct as well as circumstantial evidence of guilt. There the court held that the trial court did not err in giving a circumstantial evidence instruction where the state supports its case with both circumstantial and direct evidence, but it did not hold that such an instruction must be given in that situation. In the instant case, the state presented direct evidence in the form of testimony from co-conspirators and from the defendant's own admissions. In light of such proof, the trial court need not give the circumstantial evidence instruction. *State v. Mallett*, 732 S.W.2d 527, 536 (Mo.1987) (en banc); *State v. Bannister*, 680 S.W.2d 141, 148 (Mo.1984) (en banc).

■ The court would have erred had it given the defendant's proposed instructions defining premeditation and deliberation.

The notes on use for MAI–CR2d 33 limit the use of definitions to those instances in which the notes on use for a particular instruction expressly provide for a definition. If the notes call for no such definition, the court must not give one. *State v. Harris*, 670 S.W.2d 73, 80 (Mo.App.1984).

The court rejected the defendant's first proposed converse instruction because it did not comply with MAI–CR2d. When the defendant offered a converse instruction in proper form, however, the court gave it. Therefore, the defendant suffered no prejudice. *State v. Jewell*, 473 S.W.2d 734, 740 (Mo.1971).

■ In his proposed instruction on prior inconsistent statements, the defendant again misstated the law. The trial courts do not always admit prior inconsistent statements solely for impeachment purposes, as the defendant asserts in his proposed instruction. They may be admitted as substantive evidence in homicide prosecutions. *See* § 491.074; *State v. Moutray*, 728 S.W.2d 256, 263 (Mo.App.1987). Because the proposed instruction misstated the law, the court properly refused it. *State v. Calvert, supra.*

The trial court committed no error in refusing any of the defendant's proposed instructions.

■ Mr. Leisure next contends that the court erred in failing to remove venireman Reichman for cause. During voir dire Mr. Reichman, when asked if he would expect the defendant to testify on his own behalf responded, "Sure, ... Well, sure." Neither defense counsel, the prosecutor, nor the court, questioned Mr. Reichman any further about his opinion. Defense counsel advanced Mr. Reichman's responses as a ground for removal only after the court mentioned the matter. Counsel originally sought to remove Mr. Reichman only because his father serves on the Highway Patrol.

In *State v. Holland*, 719 S.W.2d 453 (Mo. 1986) (en banc), and *State v. Wolff*, 701 S.W.2d 777 (Mo.App.1985), the courts reversed convictions when the trial court

failed to remove for cause jurors who stated that they would expect the defendant to take the stand to tell his side of the story. In both of those cases the veniremen were told that the state had the burden of proving the defendant guilty even if the defendant presented no evidence on his behalf, yet the veniremen maintained their reluctance to accept uncritically the defendant's failure to testify. That attitude deprived the defendant in each case of a full panel of qualified jurors on which to exercise his peremptory challenges. *Holland,* 719 S.W.2d at 454; *Wolff,* 701 S.W.2d at 718. Similarly, in *State v. Byrd,* 646 S.W.2d 419, 423 (Mo.App.1983), the court reversed when two veniremen who shared that attitude actually served on the jury.

Other cases have found no error when the veniremen made such statements but ultimately agreed to follow the court's instruction concerning the state's burden of proof. *State v. Griffin,* 756 S.W.2d 475, 481 (Mo.1988) (en banc); *State v. Grubbs,* 724 S.W.2d 494, 497 (Mo.1987) (en banc). The trial judge may properly refuse to remove a juror who has indicated that he will yield his personal opinion to the court's instruction on the law. *Griffin, supra.*

In each case we must review a challenge for cause on its own facts. *State v. Stewart,* 692 S.W.2d 295, 298 (Mo.1985) (en banc).

> While trial court refusal to sustain a challenge for cause constitutes reversible error, ... it is well established that the trial court has wide discretion in determining the qualifications of a venireman, and its decision thereon will not be disturbed absent a clear abuse of discretion and a real probability of injury to the complaining party.... A clear line cannot be drawn for all cases as to when a challenge for cause should be sustained; there will be instances in which an appellate court might have done differently but cannot say there was an abuse of discretion; each case must be judged on its particular facts; a determination by the trial judge of the qualifications of a prospective juror necessarily involves a judgment based on observation of his demeanor and, considering that observa-

tion, an evaluation and interpretation of the answers as they relate to whether the venireman would be fair and impartial if chosen as a juror.... Because the trial judge is better positioned to make that determination than we are from the cold record, doubts as to the trial court's findings will be resolved in its favor....

*State v. Smith,* 649 S.W.2d 417, 422 (Mo. 1983) (en banc) (citations omitted). The court must consider the entirety of a venireman's responses and not base its decision on a single statement. *Id.* at 425. Nor in this case should we overlook the fact that defendant's counsel, the person most sensitive to any prejudice to defendant in Mr. Reichman's comment, did not react to that comment.

We have reviewed the entire transcript of the voir dire. Mr. Reichman's answer that he would like to hear the defendant testify came before the court instructed him on that issue. That expression of his opinion followed a question that suggested the answer. Further examination of Mr. Reichman on other subjects supports the trial court's explicit finding that he would be a fair and impartial juror. In this close case, we cannot find an abuse of discretion in the court's failure to remove him for cause.

The defendant presents two arguments under his third point of error. He contends that the court erred by admitting hearsay testimony and that it erroneously admitted improper evidence of other crimes.

■ John Ramo testified about the 1964 murder of Paul Leisure's cousin, Richard Leisure, and the victim's participation in the escape of the murderer. Ramo testified that he learned of those facts from Paul Leisure. That testimony did not amount to inadmissible hearsay. It was not offered to prove that the murder occurred or that Michael's participated in it. Rather, it showed that the defendant believed those allegations. The court could properly admit the testimony to show the defendant's state of mind rather than to show the truth of the matters asserted. *See State v. Harris,* 620 S.W.2d 349, 355

(Mo.1981) (en banc). Moreover, even if we assume that the testimony amounted to hearsay, it repeated declarations made by the defendant. An exception to the hearsay rule permits a court to admit statements of a party. *State v. Rogers,* 674 S.W.2d 608, 612 (Mo.App.1984). Ramo's testimony falls within that exception.

■ Another exception to the hearsay rule renders out of court statements of a co-conspirator admissible. *State v. Pizzella,* 723 S.W.2d 384, 388 (Mo.1987) (en banc); *State v. Anding,* 689 S.W.2d 745, 753 (Mo. App.1985). To establish such admissibility, the state must present independent evidence of the conspiracy, evidence to show that the declarant made the statements in the furtherance of the conspiracy and while the unlawful purpose continues to exist. *Anding, supra.* Where evidence of the conspiracy exists, the court may admit the statements even though the alleged conspirators have not been charged with conspiracy. *Pizzella, supra.* In fact, the co-conspirator need not be charged at all. *Anding, supra.*

The defendant objects to much of Ramo's testimony, arguing ·that because no independent evidence of the conspiracy exists, the hearsay statements contained in that testimony do not fall within the co-conspirator exception to the hearsay rule. Both Ramo and Broderick, however, testified to their own involvement in the plot to kill Mr. Michaels. Moreover, the wiretap evidence contained admissions by Paul Leisure that showed him acting as leader of the conspiracy. Sufficient evidence existed to support the admission of out of court statements by the non-testifying co-conspirators.

■ The testimony at trial and the wiretap evidence showed the defendant's involvement in organized crime. The defendant correctly states the general rule that the state may not seek to prove a defendant's guilt of a particular crime by showing his propensity to commit other crimes. *See State v. Shaw,* 636 S.W.2d 667, 671–72 (Mo.1982) (en banc). Evidence of the defendant's participation in other crimes may, however, be admitted when that evidence tends to show the defendant's motive, intent, absence of mistake or accident, a common scheme or plan, or the identity of the person charged. *Id.* at 672; *State v. Pilchak,* 655 S.W.2d 646, 650 (Mo.App.1983). Here evidence of Paul Leisure's involvement in organized crime was relevant to his motive to kill Michaels and thereby seize control of the Syrian organized crime faction. The court properly admitted it.

■ The defendant's fourth point charges the trial court with error in admitting two color photographs showing the victim's shattered body. The defendant stipulated before the jury saw the pictures that Michaels' death had occurred as a result of the bombing. Therefore, he argues, they had no probative value and their admission served only to inflame the jury's passion.

The photographs are indeed unimaginably gruesome. Indeed, they are ghastly and horrifying. They show in color the bloody aftermath of bombing that severed the victim's upper torso from the remainder of his body, leaving his entrails trailing along the bloody road. The photos did nothing to prove the real issue in this case—whether Paul Leisure participated in the planning and commission of James Michaels' murder.

Nevertheless, our review of the authorities compels the conclusion that the photographs were not inadmissible. The trial court has broad discretion in determining the admissibility of such photographs. *State v. Jackson,* 499 S.W.2d 467, 472 (Mo. 1973). Justice Blackmar of the Supreme Court has even suggested that such discretion is unreviewable. *State v. Leisure,* 749 S.W.2d 366, 385 (Mo.1988) (en banc) (opinion of Blackmar, J., concurring in part and dissenting to the admission of a gruesome photograph in the penalty stage of a capital murder trial). We reach the same conclusion. Once the prosecution establishes the relevance of the photographs to a material issue in the case, even where the defendant does not contest but concedes the issue, the trial court apparently has the sole discretion to determine whether the prejudicial effect outweighs the photograph's probative value. *See State v. Cummings,* 607

S.W.2d 685, 688 (Mo.1980) ("[T]he question is not whether the photographs were gruesome and prejudicial, but whether or not they threw any relevant light on a material matter at issue.").

Moreover, recent cases on the subject reflect a low standard for relevance. *See e.g. State v. Leisure, supra*, at 379 (photo of a bombing victim of a different murder was admissible in penalty phase to prove the finding of the aggravating .circumstance of prior convictions); *State v. Gardner*, 618 S.W.2d 40, 41 (Mo.1981) (photo of the victim's decomposed body was relevant to show the body's location); *State v. Newberry*, 605 S.W.2d 117, 122 (Mo.1980) (photo is admissible to prove identity and condition of the corpse; nature and locations of the wounds; the cause of death; or to corroborate or refute testimony). The fact that the photograph is cumulative of other evidence, makes no difference, *State v. Giffin*, 640 S.W.2d 128, 132 (Mo.1982); *State v. Engleman*, 634 S.W.2d 466, 475 (Mo.1982), nor does defendant's offer to stipulate to the evidence depicted in the photograph. *State v. Cummings, supra; State v. Sherrill*, 657 S.W.2d 731, 737 (Mo.App.1983).

In *Cummings* the court did not discuss whether or why the prosecution needed the pictures of the scalded child to make its case; the photos simply showed the burned areas amply described in the medical testimony. In *State v. Gardner, supra*, the defendant did not contest the location at which the defendant and the state's witness dumped the victim's body. The court in *Newberry, supra*, admitted three color photographs of the victim, a young woman, lying dead in her bedroom, stabbed in the chest and her throat slashed. The photos in *Giffin* showed a fatal shotgun wound about which no question could have been raised, witnesses having testified without challenge that defendant shot the victim and then fled until the police a short while later caught and arrested him in possession of the shotgun; the court did not discuss the prosecutor's need to offer the photographs. In *State v. Engleman, supra*, 634 S.W.2d at 474–75 (Mo.1982), the court justified admission into evidence of three color photographs of the victim's body depicting the "considerable carnage" caused by the car bomb on the ground that they corroborated eyewitness descriptions of the body in the wreckage and because they showed the deliberation and malice of the bomber. The evidence showed that the defendant had earlier threatened to kill the victim and had once before attempted to bomb her car. In *State v. Sherrill, supra*, the evidence included defendant's statements that he had shoved Kemm, the victim, over a cliff and then stole his property. Sherrill also had told other witnesses that he intended to "roll" Kemm, who in fact had been stripped of his valuables.

The case cited by the defendant, *State v. Robinson*, 328 S.W.2d 667 (Mo.1959), held inadmissible photographs of the deceased that the Supreme Court found "extremely obscene, offensive, vulgar, horrid, and repulsive." *Id.* at 671. Similarly, in *State v. Floyd*, 360 S.W.2d 630 (Mo.1962), the court found no probative value in photographs of a badly decomposed body. But the Missouri Supreme Court brought the continued vitality of those precedents into question in *State v. Newberry, supra*, noting that the finding in *Robinson* occurred only after the court had reversed on another issue. It also recognized that *Robinson* and *Floyd* had been repeatedly distinguished in cases reviewing the admissibility of photographs of murder victims. Therefore, the court rejected the defendant's challenge to the admission of photographs of the victim lying in the bedroom with her throat cut. *Id.* at 122.

The record reveals no reason for displaying the horror of the photographs of the shredded and sundered body of Mr. Michaels to the jury. Nevertheless, under the prevailing Missouri law we must defer to the trial court's discretion exercised against a background of appellate decisions that have for twenty years rejected claims of prejudice arising from admission into evidence of gory photographs.

■ The defendant's fifth point challenges the admission of the evidence obtained through the federal court's electronic surveillance of LN & P and of his home.

He asserts that the affidavits on which the federal court based its order authorizing that surveillance did not establish probable cause. He also argues that *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), entitles him to a hearing on his allegation that the affidavit contained false information and that the trial court erred in failing to conduct a hearing on that issue.

Because the defendant has failed to provide us with a copy of the challenged affidavit in the record on appeal, we cannot review the trial court's finding on its sufficiency. *See State v. Jordan*, 751 S.W.2d 68, 74 (Mo.App.1988). Moreover, the defendant has failed to establish his right to a *Franks* hearing. Merely to allege that the affidavit contained false information does not suffice. The defendant must also show that the affiant knew of the falsity or submitted the affidavit with reckless disregard for its truth or falsity. *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684. The defendant's affidavit challenging the truth of the information in the government's affidavit provides no basis for his claim that the government intentionally or recklessly employed false information.

■ Next, the defendant asserts that he suffered prejudice as a result of the prosecutor's improper closing argument. He complains of the prosecutor's description of the defendant's involvement in organized crime and his role as an "organizer of thugs." But defendant did not object to any of those comments. The prosecutor's discussion of the defendant's involvement in organized crime amounted only to a comment on evidence that, as we discussed earlier, is relevant to the defendant's motive to commit the crime charged against him. Counsel may comment on evidence in the record. *State v. Grant*, 702 S.W.2d 857, 864 (Mo.App.1985).

The prosecutor's reference to Broderick and Ramo as thugs responded to the defendant's argument describing those worthies in the same terms. Similarly, his statement that stolen cars passed through the LN & P garage responded to defense counsel's argument that Paul Leisure ran a legitimate business. Even arguments that would otherwise be improper become appropriate when advanced in response to issues raised by the defendant's argument. *State v. Wood*, 596 S.W.2d 394, 403 (Mo. 1980) (en banc). Since the prosecutor made those arguments in response to defense counsel's argument and the factual record supported them, we find no error in the trial court's failure to intervene sua sponte in the prosecutor's closing argument.

Finally, the defendant contends that the cumulative effect of the trial court's alleged errors deprived him of a fair trial. We have found no error in any of the challenged rulings, therefore, the defendant's assertion of cumulative error must fail as well. *See Shepherd v. State*, 529 S.W.2d 943, 948 (Mo.App.1975) ("Any number of non-errors ·cannot add up to an error.").

Accordingly, we affirm the trial court's judgment.

All concur.