734 F.Supp. 395 (1990)
Ricky Lee GRUBBS, Petitioner,
v.
Paul DELO, Respondent.
No. 89-1048C(1).
United States District Court, E.D. Missouri, E.D.
April 2, 1990.
*396 Charles Seigel, III, Gallop, Johnson & Nueman, Clayton, Mo., for petitioner.
Jared Cone, Asst. Atty. Gen., Jefferson City, Mo., for respondent.

MEMORANDUM
NANGLE, Chief Judge.
Petitioner Ricky Lee Grubbs was convicted of capital murder and sentenced to death by a jury in St. Francois County, Missouri, in 1988. On direct appeal, the Missouri Supreme Court summarized the evidence as follows:
The evidence showed that the victim, Jerry Russell Thornton, lived in a trailer in the town of Miner in Scott County, Missouri. *397 On the afternoon of Wednesday, February 15, 1984, Ricky Lee Grubbs and his brother, Randy Grubbs, went to Thornton's trailer. Ricky Grubbs was acquainted with Thornton, having been at his trailer once before; Randy Grubbs had previously worked for Thornton. Both brothers wore gloves while in the trailer. When they left the trailer Thornton was dead. When the body was discovered, its hands and feet were found bound with neckties. The victim had suffered massive injuries to his upper torso, including thirteen broken ribs and a cracked sternum; a laceration of the liver and damage to the small intestine; abrasions and lacerations on the face; a broken nose and a brain hemorrhage ... Approximately thirty dollars and some food stamps were taken from the victim's trailer. The next day defendant and his brother returned to the trailer in order to set it afire and destroy the evidence. Late that evening, the fire department was summoned to put out the fire and Thornton's body was discovered.
State v. Grubbs, 724 S.W.2d 494, 495-96 (Mo. banc 1987).
Petitioner's amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 was filed July 11, 1989. For nearly all of his asserted grounds, petitioner has requested leave to engage in discovery to determine the "motives" of various counsel and the trial judge with respect to their challenged conduct. Discovery in habeas cases brought by state prisoners is governed by Rule 6 of the Rules Governing § 2254 Cases, which leaves the availability of discovery in the judge's discretion. The Court denies petitioner's requests for discovery, in part because petitioner has failed to detail the allegedly necessary discovery with the specificity required by Rule 6(b), and in part because the Court finds that "motives" are of limited relevance to the Court's consideration of the instant petition, and where relevant are adequately documented by the extensive record from petitioner's 27.26 proceedings.
Petitioner also requests an evidentiary hearing on each of his claims. Rule 8 of the habeas rules governs the availability of such a hearing, and like Rule 6 on discovery, leaves the decision to the judge's discretion. As required by Rule 8, the Court has reviewed the record of petitioner's state court proceedings, as expanded by the court file on the instant petition, and has determined that an evidentiary hearing is not required. Petitioner's requests for an evidentiary hearing are, therefore, denied.
Upon consideration of the amended petition, the response of the state, and petitioner's reply, this Court issued its order, dated December 27, 1989, rejecting in their entirety four of petitioner's thirteen enumerated grounds for granting the writ, as barred by procedural default, and rejecting as procedurally barred parts of two others of petitioner's asserted grounds. The Court now sets forth its determination on the merits of petitioner's remaining claims.

Ground A
Petitioner's ground A asserts that:
petitioner was denied his sixth and fourteenth amendment rights to effective assistance of counsel and a fair and impartial jury when counsel failed to seek exclusion of juror Meiseman for cause and the court failed to sustain petitioner's motion to strike juror Hooper after both Meiseman and Hooper stated a bias in favor of the death penalty in capital murder cases.
In order to demonstrate ineffective assistance of trial counsel, petitioner must show both that (1) the alleged act or omission of counsel, when judged in light of all the circumstances, falls outside the wide range of professionally competent assistance and (2) that the deficient performance prejudiced petitioner's defense by depriving the petitioner of a fair trial the result of which is reliable. Strickland v. Washington, 466 U.S. 668, 687, 690, 104 S.Ct. 2052, 2064, 2066, 80 L.Ed.2d 674 (1984). This burden is heavy: "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690, 104 S.Ct. at 2066.
*398 Upon review of the relevant portions of the voir dire examination (found at pp. 283-84 of Respondent's Exhibit A), the Court finds that trial counsel's failure to move that Meiseman be stricken for cause is not so egregious an error as to satisfy the first prong of the ineffective assistance test. Defense counsel inquired generally of Meiseman's row of the venire panel if any of those panel members would "automatically" impose the death penalty having found someone guilty of "premeditated, deliberate murder." The silence that greeted defense counsel's question is an initial indication that no member of that row, including Meiseman, felt that he could not consider both the capital punishment and life sentence alternatives.
Counsel's questioning of Meiseman in particular appears to be based not on misgivings specifically directed at Meiseman, but on a general mistrust of the panel's unresponsiveness:
MR. CURRAN: ... I just want to know how many of you feel that the life without probation or parole for fifty years could be an appropriate punishment for a capital murder? Do you feel it could be, Mr. Meiseman?
MR. MEISEMAN: Possibly.
CURRAN: ... Do you feel that if someone's convicted of capital murder or premeditated killing, the death penalty's the only appropriate punishment?
MEISEMAN: Not automatic, no.
CURRAN: Okay, not automatic. Do you think more often than not it's the appropriate punishment?
MEISEMAN: Probably.
CURRAN: Correct me if I'm wrong, does that mean to say that if you're in the circumstance where you convicted somebody of capital murder, you'd be more likely to return the death penalty?
MEISEMAN: Probably, yes.
Considered in its entirety, Meiseman's response to that questioning manifests a willingness to consider both the capital and life sentence alternatives. That being so, counsel's decision not to seek to strike Meiseman for cause was entirely within the range of a defense attorney's professional discretion. Because it finds no error of constitutional dimension, the Court need not undertake the prejudice prong of ineffective assistance analysis.
The trial judge's finding that Hooper was unbiased is a finding of fact subject to the presumption of correctness laid down in 28 U.S.C. § 2254(d). Patton v. Yount, 467 U.S. 1025, 1036, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984); Wainwright v. Witt, 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985). Petitioner's challenge to the trial judge's refusal to strike Hooper for cause, then, presents the question "whether there is fair support in the record for the [trial court's] conclusion that [Hooper] would be impartial." Patton, 467 U.S. at 1038, 104 S.Ct. at 2892.
Although upon voir dire Hooper stated a predilection for the death penalty in capital cases, he also indicated that he would consider both the death penalty and imprisonment if faced with the sentencing decision, and said that where the court's instructions ran contrary to any feelings he might have he would "have to go the way the court tells [him] to do it." Respondent's Exhibit E, p. 496. Under the "fair support" standard of review, the Court holds that the trial court's finding of Hooper's impartiality is entitled to the presumption of correctness, and so withstands petitioner's challenge.

Ground B
What remains of petitioner's ground B is the claim that trial counsel's failure to object to the admission of testimony regarding petitioner's post-arrest silence constituted ineffective assistance of counsel.[1] Petitioner's post-arrest silence was relatively short-lived; petitioner eventually made two statements, one oral and one written. A motion to suppress these statements was denied by the trial court, after a lengthy hearing. Respondent's Exhibit A, p. 131. At petitioner's 27.26 hearing, trial counsel *399 testified that she could not specifically recall a reason or strategy for failing to "call attention" to, by objecting to, testimony about petitioner's initial refusal to make any statement to the Scott County sheriff. Respondent's Exhibit I, p. 69.
Nonetheless, given defense counsel's efforts to suppress petitioner's statements and close attention at the suppression hearing to the circumstances surrounding petitioner's initial silence and later statements, see Respondent's Exhibit A, pp. 25-29, 39-41, 60-68, the Court believes that counsel's failure to object to testimony about petitioner's short-lived silence was deliberate. Petitioner is unable to overcome the strong presumption that counsel's decision, in light of the failure of the motion to suppress statements, not to assert the inadmissibility of petitioner's temporary post-arrest silence was a strategic one within the "wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S.Ct. at 2066. Furthermore, given that petitioner's post-arrest statements were ultimately introduced into evidence, the Court is hard-pressed to perceive any prejudice to petitioner from testimony as to petitioner's initial refusal to make a statement.

Ground C
Petitioner's ground C presents two claims of ineffective assistance of trial counsel that must be considered on the merits: (1) counsel's failure to establish a lack of blood on the carpet beneath the victim's body and (2) counsel's failure to object to testimony that there was blood on the carpet.[2] In addition, ground C alleges a violation of due process in the prosecution's failure to preserve the carpet as evidence. Petitioner argues that the establishment of a lack of blood on the carpet would have shown that the victim was already dead when petitioner cut his throat, and would thereby have negated the existence of premeditation and certain aggravating factors.
As to the alleged failings of trial counsel, this Court is guided by the presumptively correct factual determinations made by the 27.26 court in considering these claims:
The evidence reveals that Movant's counsel contacted an independent pathologist to review autopsy reports, photographs and other documentation in an effort to establish that the victim was already dead when the victim's neck was cut. Further, defense counsel did question the state's pathologist in an effort to make the jury aware as to the extent of blood on the floor or blanket under the victim's neck. The overwhelming testimony to the jury based upon photographs of the crime scene, testimony of witnesses who were physically present at the scene of the incident and the expert opinion of the state's pathologist could not be overcome.
Respondent's Exhibit J, p. 76. The Court finds that trial counsel's efforts to rebut the State's evidence that the victim was still alive when his throat was cut were sufficient to comport with constitutional standards of adequate assistance.
Even were the Court to find otherwise, petitioner's inadequate assistance claims would be unavailing for petitioner's inability to demonstrate prejudice. The Court is unpersuaded that the evidentiary intimation that petitioner had slit the victim's throat after having killed him by some other means would have proved at all helpful to petitioner's defense. The Court fails to see how such a fact, if believed by the jury, would have negated the existence of premeditation or tended to support a finding that the crime was not outrageous, horrible and inhumane. In the language of Strickland, petitioner has not met the burden of showing "a reasonable probability that, absent the [alleged] errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S.Ct. at 2068.
*400 The Supreme Court has held that the state's failure to preserve evidence is not a denial of due process unless the state acted in bad faith, the evidence had apparent exculpatory value and comparable exculpatory evidence was not reasonably available to the defendant. California v. Trombetta, 467 U.S. 479, 488-89, 104 S.Ct. 2528, 2533-34, 81 L.Ed.2d 413 (1984). The court reaffirmed the bad faith rule in the context of the state's preservation of material of unknown evidentiary value in Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1989). See also Manchester v. Clarke, 889 F.2d 1090 (8th Cir. 1989). Petitioner has failed to establish any of these three elements. The Court suspects, based on the presumptively correct findings of the 27.26 court, that petitioner cannot establish these elements:
[T]here was no evidence presented at trial or any subsequent motion to show that the State had in its possession any carpeting or other surfaces found under the body of Jerry Thornton, victim.... [T]he testimony establishes that the state did not suppress or destroy any carpeting or other substances and in fact the state did not have such substances in its possession and no such samples had been taken by the state except the state fire marshal who removed samples of carpeting and flooring in other areas of the mobile home....
Respondent's Exhibit J, pp. 69-70, 82. In light of these findings, the Court concludes that the petitioner has not shown the state's bad faith. The 27.26 court's findings outlined earlier as to the presence of blood on the carpet indicate likewise, as noted above, that the petitioner cannot demonstrate that the carpet had obvious exculpatory value.

Ground H
Ground H makes due process and ineffective assistance of counsel claims concerning trial counsel's failure to object to, or preserve objections to, five statements made by the prosecutor to the jury at petitioner's trial. The standards for analysis of the ineffective assistance claims are set out above; both parties recognize that the due process standard applicable in this context is set forth in Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). To violate due process violation, a prosecutor's improper comment must "constitute[] a `failure to observe that fundamental fairness essential to the very concept of justice.'" Id. at 642, 94 S.Ct. at 1870, quoting Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941). When applying this analysis,
a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.
Donnelly, 416 U.S. at 647, 94 S.Ct. at 1873.
First, petitioner challenges trial counsel's failure to object to the prosecutor's statement, as paraphrased by petitioner, "that based upon his review of the reports brought to him by law enforcement officials, he personally determined that enough evidence existed to support a charge." Amended Petition, p. 11. Petitioner claims that "the prosecuting attorney was making [a] personal assurance of special knowledge and arguing that a conviction was supported by matters outside the evidence." Id. The Court finds both petitioner's paraphrase of the prosecutor's remarks and its conclusion therefrom highly dubious.
The context of the challenged statement is the introduction to the prosecution's closing argument, in which the prosecutor outlined the process by which a criminal defendant is brought to trial:
Really, the jury trial system and the actual jury process is the heart of the criminal justice system here in the United States. The police officers and deputies and law enforcement agencies investigate crimes and gather evidence to prosecute people who commit crimes. That's the first step, the investigating step, and that's where the law enforcement officials come in. The second step is when they bring the evidence and their reports *401 to me and I determine, as Prosecuting Attorney, whether or not we have enough evidence to go forward in the prosecution of a person for the crime that he's charged with. That's the second step. When the prosecutor or other appropriate authority decides that there is enough evidence and a charge is lodged against an individual, then the third step takes place and that's the guilt or innocence phase....
Respondent's Exhibit A, p. 522. The Court is entirely unpersuaded that the jury might have been misled by these comments to believe anything other than the obvious and widely understood fact that, with respect to any potential criminal defendant, a prosecutor makes a determination, based on the investigation and its fruits, whether or not to pursue the case. The Court here finds neither a due process nor a sixth amendment violation.
Second, petitioner challenges trial counsel's failure to object when, during closing argument at the guilt stage of petitioner's trial, "the prosecutor told the jury to ignore the element of deliberation as set out in the instructions." Amended Petition, p. 11. In recapitulating the evidence as to the manner in which the victim died, the prosecutor said:
How can you not intend to kill somebody under those circumstances? ... Don't pay any attention to all this coolly and fully reflecting and that kind of thing. The facts are there. The only facts that you have before you are facts that show the defendant is guilty of capital murder.
Respondent's Exhibit A, p. 539.
In evaluating whether the prosecutor's remarks so infected petitioner's trial as to rob it of the fundamental fairness required by due process, this Court is guided by the Supreme Court's admonishment, quoted above, not to lightly infer from a prosecutor's poorly crafted statement either the prosecutor's bad intentions or the jury's susceptibility to being led astray from the extensive and carefully worded instructions of the court. Instruction 5 sets out, and Instruction 6 specifically reiterates, the necessity of a finding of deliberation. Respondent's Exhibit B, pp. 94-5. Though the prosecutor's remarks do not stand as a model of trial practice, neither do they rise to the level of a trial error of constitutional dimension, particularly in light of the trial court's clear instructions, which were directly the contrary to the most damaging possible interpretation of the prosecutor's remarks. For the same reasons, petitioner is unable to demonstrate prejudice from trial counsel's failure to object to the statement, and thus the Court likewise finds no sixth amendment violation.
Third, ground H challenges trial counsel's failure to preserve two successful objections to improper remarks by the prosecutor at the sentencing stage of petitioner's trial concerning (1) the possibility of pardon and commutation and (2) petitioner's ability to continue to see his family should the jury fail to impose the death penalty. This Court disposes of the second of these challenges by noting that petitioner has mischaracterized the objection, which appears from the record to have been directed at the prosecution's enumeration of the various relatives ("his brother, his sister-in-law, his mother") of whose company the victim was deprived, on the basis that there was "no evidence as to who the people are in the courtroom." Respondent's Exhibit A, p. 614. The Court declines to reformulate petitioner's argument for him based on the objection actually made and sustained, and will not address the point further except to note that the objection was not a substantive one and that the trial court instructed the jury to disregard the prosecutor's unwarranted specificity about the victim's relatives.
The prosecution's remarks about pardon and commutation and the aftermath thereof was as follows:
MR. FUCHS: ... Now the alternative to the death penalty and no doubt there is an alternative, life without probation and parole for fifty years. On its face that sounds like serious punishment and if on its face it would stand on its face it would be. But you don't think about pardon, commutation 

*402 MR. CURRAN: Judge, I'll have to object. That's improper argument. There's no instruction on that.
THE COURT: The objection will be sustained. Jury instructed to disregard it.
Respondent's Exhibit A, p. 614. The trial court denied counsel's motion for mistrial based on the remarks, and counsel did not pursue the objection in a motion for new trial. The Court finds no constitutional infirmity in the treatment of this improper argument, which was so timely objected to and cured that no unfairness or prejudice to petitioner reasonably can be inferred.
Finally, ground H raises trial counsel's failure to object when the prosecutor said, during his argument to the jury in the sentencing phase:
The death penalty in this case  If you don't impose the death penalty in this case, then what kind of case would make it appropriate? This is one of the most vicious and brutal attacks on an individual that I've seen. So if you don't think the death penalty is appropriate in this kind of case, then where is it appropriate?
Respondent's Exhibit A, p. 615. Petitioner contends that the argument was improper because a prosecuting attorney "may not express an opinion implying awareness of facts not available to the jury." Reply of Petitioner filed August 14, 1989, p. 42. That rule has no application here.
The prosecutor's comment about the brutality of the attack expresses an opinion about the killing, but without any intimation of facts unknown to the jury. Missouri law is clear that either party's counsel in a criminal case "may draw any reasonable inference from the evidence which each believes in good faith to be justified." State v. Leisure, 749 S.W.2d 366, 378 (Mo. banc 1988). Missouri courts have often upheld remarks similar to the one challenged here, when found to be based on the evidence. See, e.g., State v. Tate, 468 S.W.2d 646 (Mo.1971), in which the Missouri Supreme Court wrote:
We find no fault with this "type" of argument (that the killing was vengeful, based upon a senseless reason, or simply because the robbers were evil young tramps). "Mean punks" is strong language but in the face of evidence of a brutal, insensate, vindictive killing the remark may be considered as a reasonable deduction and a legitimate comment on the evidence[.]
Id. at 650. The Missouri Supreme Court's analysis of the "vicious and brutal attack" remark by the prosecutor in petitioner's case is the same, i.e., that it was supported by the evidence. Respondent's Exhibit M, p. 119.
This Court's determination as to the constitutional ramifications of the prosecutor's remark is guided largely by the Court's agreement with the state law analysis. The prosecutor's opinion, reasonably supported by the evidence, did not infect petitioner's trial with any appreciable unfairness, much less such unfairness as to violate due process standards. Likewise, counsel's failure to object cannot constitute ineffective assistance of counsel when the objection, if made, should rightly have been overruled.

Ground I
Petitioner alleges ineffective assistance of trial counsel in counsel's failure to present evidence of two allegedly mitigating circumstances at the punishment phase of petitioner's trial. These ineffective assistance claims fail because "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690, 104 S.Ct. at 2066. Petitioner earlier raised these claims on his 27.26 motion. The testimony of his trial counsel at the 27.26 hearing demonstrates that counsel thoroughly and thoughtfully considered bringing the evidence at issue in mitigation, but for sound strategic reasons, decided not to. Such was also the finding of fact by the state court on the 27.26 motion, see Respondent's Exhibit J, pp. 61 and 69, to which is owed the § 2254(d) presumption of correctness.
First, petitioner points to the failure to call Michael Hazel, prosecuting attorney from Pemiscot County, "who would have testified that Petitioner had alerted him to *403 a murder plot on his life" and that Petitioner "had testified in an attempted murder trial ... against the individual who had devised the murder plot." Amended petition, p. 13. Counsel testified that both she and an investigator from her office had spoken with Hazel concerning the possibility of testifying on petitioner's behalf, but:
[t]here were several things that he indicated to myself and primarily to my investigator that he would say if called as a witness and made clear to us that he would inform the prosecutor of, if we subpoenaed him as a witness, that were detrimental. One of them was just a general attitude about Ricky. Although he spoke favorably of him and of the help that he had done for him, he would also intersperse his conversation with words like, "Well, I believe he's a professional criminal"; things of that nature, that we were afraid might be used in his testimony. But primarily we were concerned with the fact that he said that Ricky had told him that he had killed a man before and we felt that would sound particularly bad, especially since he did not have any convictions for killing anybody and that nothing of that sort would arise during the case, unless it came through his testimony ...
We also discussed with Mr. Grubbs the fact that he was a little bit concerned about ... what the effect would be if he had to serve time in prison. He was a little uncertain as to what the effect would be if it became commonly known that he had cooperated in the prosecution of another case.
Respondent's Exhibit I, pp. 64-65. Counsel further testified that consideration was given to calling Hazel at trial but that the idea was rejected based on the foregoing concerns.
Second, petitioner challenges counsel's failure to Dr. Gary Bassett, who, petitioner claims, would have testified to his conclusion, based on his independent psychological examination of petitioner, that petitioner "was suffering from severe mental and emotional disturbance at the time of the commission of the crime." Amended petition, pp. 13-14. Counsel testified at the 27.26 hearing that use of Dr. Bassett's testimony at trial was considered and discussed with petitioner, but rejected:
[p]rimarily because of concern about opening up the Farmington psychiatric report or the report that was done at Farmington or Fulton State Hospital, whichever hospital it was. That report was negative. It talked about him being hostile, anti-social and those kinds of labels, as well as Dr. Bassett's characterization of him would also be anti-social. We believed that that would be damaging for the jury to see him in those kinds of terms, even though Dr. Bassett believed that he was under a lot of stress and that he did not deal with it in a normal way and that these were factors that were involved in his behavior. The feedback that I got from people I discussed it with was that no one seemed to be real impressed with talk about stressors and those kinds of things, which is what Dr. Bassett primarily had to say, which could be considered as helpful.
Respondent's Exhibit I, p. 71. The Court finds that the considerate and strategic nature of trial counsel's decisions regarding these two topics of potential evidence is squarely within the range of professionally competent assistance.

Ground J
Next petitioner challenges on eighth amendment grounds the constitutionality of one of the aggravating circumstances found to exist by the sentencing jury: that the murder "involved torture and depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible and inhuman."[3] Instruction No. 17, Respondent's Exhibit B, p. 131. Petitioner challenges the aggravating circumstance as applied; the circumstance at issue has been found not to be unconstitutional on its face. See Mercer v. Armontrout, 864 F.2d 1429, *404 1435 (8th Cir.1988); State v. Newlon, 627 S.W.2d 606 (1982).
Petitioner's argument is formulated primarily in reliance upon Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (hereinafter "Cartwright II") and Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). In Godfrey, the Supreme Court overturned a death sentence based on a single Georgia statutory aggravating circumstance because the sentence was "based upon no more than a finding that the offense was `outrageously or wantonly vile, horrible and inhuman,'" which words the court found to imply no "inherent restraint on the arbitrary and capricious infliction of the death sentence." Godfrey, 446 U.S. at 428, 100 S.Ct. at 1765. In Cartwright II, the Supreme Court considered the application of an Oklahoma aggravating circumstance that a particular murder is "especially heinous, atrocious or cruel," and held that the case was controlled by Godfrey. Cartwright II, 108 S.Ct. at 1859. These cases set forth the rule that aggravating circumstances, as submitted and explained to a sentencing jury, must:
define the crimes for which death may be the sentence in a way that obviates "standardless [sentencing] discretion" [and] ... channel the sentencer's discretion by "clear and objective standards" that provide "specific and detailed guidance," and that "make rationally reviewable the process for imposing a sentence of death."
Godfrey, 446 U.S. at 428, 100 S.Ct. at 1765 (citations omitted).
The standards for determining the validity of the aggravating circumstance as applied are not so one-dimensional as either party would have the Court believe. Petitioner stresses the necessity of sufficiently channeling the sentencing jury's discretion so as to to restrain the arbitrary and capricious infliction of the death sentence. Respondent stresses the Missouri Supreme Court's attempts at limiting interpretation of the "depravity of mind" aggravating circumstance so as to meet constitutional standards of definiteness. Aspects of each of these distinct considerations are important to a determination of the validity of the circumstance as applied in a particular case. The constitutional infirmity arising from unchanneled jury discretion in the application of an aggravating circumstance that is susceptible to vagueness can be "cured" by an appellate court's affirmance of the sentence based on a constitutionally limited application of the circumstance to the facts of the case. Cartwright II, 108 S.Ct. at 1859.
First, the Court considers whether the sentencing jury's discretion was sufficiently guided by the instruction before it.
Because the channeling function of an aggravating circumstance requires objective determination of such a factor, it must be described in `terms that are commonly understood, interpreted and applied.' Cartwright v. Maynard, 822 F.2d 1477, 1485 (10th Cir.1987) ... The Cartwright court recognized that if `an aggravating circumstance is defined and applied so broadly that it conceivably could cover every first degree murder, then it obviously cannot fulfill its constitutional responsibility to eliminate the consideration of impermissible factors and to provide a recognizable and meaningful standard for choosing the few who are to die.' [Id. at 1485.]
Newlon v. Armontrout, 693 F.Supp. 799, 813 (W.D.Mo.1988) (hereinafter "Newlon I"). The district court in Newlon vacated the petitioner's death sentence based on its finding that "depravity of mind" was not in that particular case capable of objective determination, given the lack of a "clear, limiting directive." Id. The Eighth Circuit affirmed. Newlon v. Armontrout, 885 F.2d 1328 (8th Cir.1989) (hereinafter "Newlon II").
As the Eighth Circuit explained:
The record in this case specifically shows that the jury did not know what the phrase "depravity of mind" meant. During penalty phase deliberations, the jury asked the court to define the phrase, but the court advised the jury that it could not give them further instructions. This *405 refusal to clarify the term "depravity of mind" when the jury plainly did not understand the meaning of the phrase and actually sought a limiting directive left the jury free to administer the statute "in an arbitrary and unpredictable fashion."
Id. at 1334 (citation omitted). The Court of Appeals' examination of the actual events and instructions at sentencing follows the Supreme Court's example in Godfrey, in which the Supreme Court's reversal of the death sentence was motivated in part by the lack of instructions given by the trial judge to the jury on the meaning of "outrageously or wantonly vile, horrible and inhuman." Id. 446 U.S. at 429, 100 S.Ct. at 1765.
The record in the instant case shows that the trial judge gave no instruction elucidating for the jury the meaning or scope of application of any of the terms in the aggravating circumstance here at issue. The jury's verdict form recites the aggravating circumstance verbatim as found in the instructions, without any further discussion of the specific facts on which the jury based its finding that the circumstance existed. Nonetheless, the aggravating circumstance found here is distinguishable in one constitutionally significant respect from those found invalid as applied in Godfrey, Cartwright and the Newlon cases. In the instant case, the jury's discretion was appropriately channeled in that the circumstance included a necessary finding that the murder involved torture.[4] The Supreme Court itself has recognized that the term "torture" is sufficiently definite of meaning and scope that it is not to be classed with terms like "depravity of mind" and the host of nebulous and qualitative adjectives, such as "vile," "horrible" and "inhuman," which require limiting constructions: "We also do not hold that some kind of torture or serious physical abuse is the only limiting construction of the heinous, atrocious, or cruel aggravating circumstance that would be constitutionally acceptable." Maynard I, 108 S.Ct. at 1859-60. The plain implication of the Court's statement is that a torture element is sufficiently limiting to comport with constitutional standards. The Eighth Circuit has recently so indicated as well, in Smith v. Armontrout, 888 F.2d 530 (8th Cir.1989), in which it found that a jury finding of torture "amounts to a limiting construction of the statute, or to an application of its words sufficiently constrained by a definite standard to escape condemnation under the Eighth Amendment." Id. at 538.
As the Court finds that the aggravating circumstance applied by the sentencing jury was constitutionally defined, the Court need not undertake an analysis of the Missouri Supreme Court's review of the sentence to determine whether it would "save" a constitutionally inadequate treatment at the punishment stage. The Court notes its agreement, however, with the Missouri Supreme Court's statement that the evidence in the case "demonstrates that a reasonable juror could find" that the murder involved torture. Grubbs, 724 S.W.2d at 500.[5] In particular, the evidence, as summarized by the Missouri Supreme Court, showed that:
When the body was discovered, its hands and feet were found bound with neckties. *406 The victim had suffered massive injuries to his upper torso, including thirteen broken ribs and a cracked sternum; a laceration of the liver and damage to the small intestine; abrasions and lacerations on the face; a broken nose and a brain hemorrhage. An expert witness testified that the victim was alive when the trauma was inflicted to his abdomen ... Defendant stated that he cut [the victim's] throat ... The forensic pathologist who conducted the autopsy testified that [the victim] died after his lungs filled with fluid from shock.
Id. at 495-96. This evidence as to the extent and kind of the injuries inflicted to the victim while alive is legally sufficient to support the "torture" limiting construction, as is required to satisfy due process. Smith, 888 F.2d at 538. The Court holds, then, that the application of the "torture and depravity of mind" aggravating circumstance in the instant case was constitutional.

Ground K
In Ground K, petitioner challenges the constitutionality of the jury instruction on mitigating circumstances, under Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). Such a claim had not previously been presented by petitioner to any state court, so that this Court's consideration of it would ordinarily be barred by the procedural default. In its December 27, 1989, order, however, this Court held that cause for the default existed because a Mills challenge was not reasonably available to petitioner's state court counsel, given that petitioner was convicted in 1986 and the Missouri Supreme Court rejected petitioner's direct appeal in 1987, and the decision in Mills issued in 1988.
Since that earlier order, however, the Court has discovered two recent Eighth Circuit opinions directing the opposite conclusion, i.e., that "the tools with which to make a Mills argument" have been available since Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Smith v. Armontrout, 888 F.2d 530, 545 (8th Cir. 1989). In Stokes v. Armontrout, 893 F.2d 152 (8th Cir.1989), the Eighth Circuit reaffirmed the view expressed in Smith. Bound by the Court of Appeals' determination of this question, this Court now reverses its earlier decision as to Ground K, and holds that the procedural default cannot be excused. Consideration of the merits of petitioner's Mills claim is, therefore, barred.

Ground L
Ground L is petitioner's claim that the trial court improperly submitted to the jury two aggravating circumstances not supported by the evidence: (1) that petitioner committed the murder "for the purpose of receiving money or any other thing of monetary value," and (2) that the murder was committed "for the purpose of preventing a lawful arrest" of petitioner.[6]See Instruction No. 17, Respondent's Exhibit B, p. 131. The Missouri Supreme Court rejected this contention on direct appeal, holding that a reasonable jury could have found, based on the evidence, that these circumstances existed. Grubbs, 724 S.W.2d at 500. In his concurrence, Judge Blackmar disagreed with that holding. Id. at 502. Based on a careful review of the trial record, this Court makes its own determination of this question of law, and in so doing so is in agreement with Judge Blackmar that:
[N]othing in the record ... support[s] the finding that the defendant killed "for the purpose of preventing his lawful arrest." The fact that the defendant and his brother wore gloves in February, and the fact that money and food stamps were missing (but not found on the defendant), provide, at the most, scanty support for the assertion that the killing *407 was committed "for the purpose of receiving money or other thing of value."
Id.
The only direct evidence with respect to the missing money and food stamps was petitioner's testimony that his brother Randy, who was also involved in the killing, took them before leaving the trailer. The evidence suggests that the gloves were worn so as not to leave incriminating fingerprints on the knives with which the victim was cut; the record provides no basis whatsoever for any connection between the gloves petitioner and his brother wore at the scene and any preexisting purpose of pecuniary gain. This negligible evidence is insufficient to support a finding beyond a reasonable doubt that petitioner killed the victim for monetary gain.
Even less support exists in the record for a reasonable finding that the murder was designed to prevent petitioner's arrest. The Court suspects that the evidence that petitioner and his brother later returned to the scene and set the trailer on fire in an attempt to conceal the murder was somehow construed by the jury as evidence of this aggravating circumstance, but such an inference is backwards: the fire was set for the purpose of preventing arrest for the murder, perhaps, but the murder itself had no apparent purpose of evading arrest. The Court believes, then, that both of the challenged aggravating circumstances were erroneously submitted to the jury.
Nonetheless, this Court further finds that any impropriety in submitting these two circumstances to the jury is insufficient to warrant the vacation of petitioner's sentence. Under Missouri law, as Judge Blackmar also recognized, "where at least two aggravating circumstances are found, the failure of one does not mandate reversal or resentencing." Mercer v. Armontrout, 844 F.2d 582, 584 (8th Cir.1988); see also cases cited by Judge Blackmar in Grubbs, 724 S.W.2d at 502, n. 3. As a matter of federal constitutional law, the invalidation of one aggravating circumstance is only harmless error where "the elimination of the improperly considered aggravating circumstances could not possibly affect the balance" of aggravating and mitigating factors, Barclay v. Florida, 463 U.S. 939, 958, 103 S.Ct. 3418, 3429, 77 L.Ed.2d 1134 (1983), or "where the aggravating circumstances relied upon genuinely narrow the class eligible for the death penalty," Mercer, 844 F.2d at 585, discussing Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983).
In petitioner's case, the jury found to exist not only the two aggravating circumstances here challenged as unsupported, but also five others: (1) that the murder involved torture and depravity of mind, and so was outrageous, horrible and inhuman, and (2) that petitioner had four previous burglary convictions, (3) one stealing conviction, (4) one theft conviction and (5) one armed robbery conviction. The prior offenses were submitted as nonstatutory aggravating circumstances. As the sentencing scheme did not require the jury to specify the mitigating circumstances it found to exist, the Court cannot with any certainty determine that the balance of aggravating and mitigating factors would ultimately be unaffected by the elimination of the two improperly considered aggravating circumstances, but certainly the five remaining aggravating factors might well have been sufficient to outweigh any existing mitigating factors.
More importantly, the remaining aggravating circumstances genuinely narrow considerably the class eligible for the death penalty. As "the Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances," Zant, 462 U.S. at 890, 103 S.Ct. at 2749, and the jury made an individualized determination of the existence of five aggravating circumstances that rationally circumscribe death penalty eligibility, petitioner's sentence withstands the challenge set forth in Ground L.

Ground M
Ground M invites this Court to second-guess the Missouri Supreme Court's proportionality review of petitioner's sentence. Clearly, petitioner is incorrect to the extent that he asserts that the Missouri *408 Supreme Court did not conduct such a review. The court's opinion states:
Under independent and mandatory review, and after examining other cases in which the death penalty was imposed and giving consideration to both this crime and this defendant ... neither excessiveness nor disproportionality taints the sentence in this case.
Grubbs, 724 S.W.2d at 501. The court goes on to cite numerous similar cases demonstrating the proportionality of petitioner's sentence. Petitioner, then, asks this Court to make a de novo determination of proportionality.
The Missouri Supreme Court, as does petitioner here, cites a Missouri statute as the source of the requirement of proportionality review.[7] Respondent correctly points out that this Court is bound by the state supreme court's interpretation of state law. Ricketts v. Adamson, 483 U.S. 1, 5-7, n. 3, 107 S.Ct. 2680, 2683-84 n. 3, 97 L.Ed.2d 1 (1987). Because the United States Supreme Court has made plain that proportionality review is not constitutionally required, Pulley v. Harris, 465 U.S. 37, 50-51, 104 S.Ct. 871, 879, 79 L.Ed.2d 29, and because "[a] federal court may not issue the writ on the basis of a perceived error of state law," id. at 41, 104 S.Ct. at 874, this Court has no basis for reviewing the proportionality finding of the Missouri Supreme Court.

Conclusion
Having examined the merits of all of petitioner's claims not foreclosed by procedural default, the Court finds no constitutional violation entitling petitioner to the relief he now seeks. Therefore, the instant amended petition for writ of habeas corpus is denied. Petitioner is granted a certificate of probable cause to appeal. Finally, the Court vacates its June 2, 1989, order staying petitioner's execution, replacing it with an order staying execution for thirty days, during which time petitioner may seek a stay from another court.

ORDER
Pursuant to the memorandum filed herein this day,
IT IS HEREBY ORDERED that petitioner's request for reconsideration of the Court's procedural bar rulings be and is denied.
IT IS FURTHER ORDERED that petitioner's requests for discovery be and are denied.
IT IS FURTHER ORDERED that petitioner's requests for an evidentiary hearing be and are denied.
IT IS FURTHER ORDERED that petitioner Ricky Lee Grubbs' Amended Petition, under 28 U.S.C. § 2254, for Writ of Habeas Corpus by a Person in State Custody be and is denied.
IT IS FURTHER ORDERED that petitioner be and is granted a certificate of probable cause to appeal.
IT IS FURTHER ORDERED that this Court's June 2, 1989, order staying the execution of the death penalty on petitioner Ricky Lee Grubbs be and is vacated and replaced by the next following order.
IT IS FURTHER ORDERED that the execution of the death penalty on petition Ricky Lee Grubbs be and is stayed for a period of thirty (30) days from the date of this order. Petitioner Ricky Lee Grubbs must obtain any further stay of execution from the United States Court of Appeals for the Eighth Circuit or from the United States Supreme Court or from a missouri state court.
NOTES
[1] In its December 26, 1989, order, the Court found procedurally barred that portion of Ground B alleging appellate counsel's ineffective assistance for failure to challenge the admissibility of petitioner's post-arrest statements.
[2] In its December 26, 1989, order, the Court found procedurally barred that portion of Ground C alleging trial counsel's ineffective assistance for failure to preserve the carpet as evidence.
[3] The aggravating circumstance as worded in the jury instructions here quoted is based on § 565.032.2(7) R.S.Mo.
[4] The aggravating circumstance, as defined for the jury, asked whether the murder "involved torture and depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible and inhuman." The emphasis added to the conjunctive here highlights the necessity of a finding of torture for the aggravating circumstance to apply.

The pertinent portion of the aggravating circumstance in Godfrey reads "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim," but there the prosecutor told the jury three times during his sentencing argument that the state made no allegations of torture or aggravated battery. Godfrey, 446 U.S. at 426, 100 S.Ct. at 1763. The Cartwright aggravating circumstance was that the murder was "especially heinous, atrocious or cruel." Cartwright II, 108 S.Ct. at 1856. The Newlon instruction omitted reference to torture: "whether the murder ... involved depravity of mind and that as a result thereof it was outrageously or wantonly horrible or inhuman." Newlon I, 693 F.Supp. at 812.
[5] The Court also notes, however, that the Missouri Supreme Court erroneously paraphrased the aggravating circumstance here in question as reading "torture or depravity of mind." Id.
[6] The amended petition also challenged as improper the submission of the statutory aggravating circumstance that the murder was committed by someone with "one or more serious assaultive criminal convictions." After respondent pointed out in its response to the show cause order that no such statutory instruction was given, petitioner, in his reply to petitioner's response, apparently withdrew his misdirected challenge to submission of an assaultive convictions circumstance.
[7] Both respondent and the Missouri Supreme Court cite § 565.014.3(3) for the requirement, but that provision was repealed and replaced by the largely similar § 565.035.3(3), effective October 1, 1984.